ROCKLAND BLEACH & DYE WORKS, CO., INC.
*v.* H. J. WILLIAMS CORPORATION, INC.

[No. 265, September Term, 1965.]

376

*Decided April 28, 1966.*

The cause was argued before Prescott, C. J., and Ham-

MOND, MARBURY and McWILLIAMS, JJ., and CARTER, J., Chief Judge of the Second Judicial Circuit, specially assigned.

*Donald N. Rothman* and *David H. Fishman,* with whom were *Hamilton O'Dunne* and *Gordon, Feinblatt & Rothman* on the brief, for appellant.

*John F. King* and *William C. G. Barnes,* with whom were *Anderson, Coe & King* on the brief, for appellee.

MARBURY, J., delivered the opinion of the Court.

Rockland Bleach and Dye Works Co., Inc. (Rockland), plaintiff-appellant, filed a declaration against H. J. Williams Corporation, Inc. (Williams), defendant-appellee, containing three counts, all of which related to damages suffered as a result of excavation and construction work undertaken in 1962 by Williams as general contractor on the section of the Jones Falls Expressway adjacent to Rockland's land in Baltimore County, Maryland. Rockland complained that by reason of Williams' acts, its water supply had been cut off on two separate occasions, which caused interruptions in the processing operations being carried on in its bleach and dye works. The first count alleged that Williams had committed trespass in March, 1962, by causing or allowing mud and other debris to invade Rockland's property, which completely filled its reservoir located thereon. The second count sounded in negligence, and was related to the same facts set forth in the first count. The third count alleged another incident which occurred in April 1962, when a backhoe being operated by Williams' employee in the vicinity of Rockland's land broke one of its water pipes. The case was tried by a jury, Judge Menchine presiding, and at the conclusion of plaintiff's case, the lower court granted defendant's motion for a directed verdict on count one. At the conclusion of the whole case, the jury returned a verdict in favor of the defendant on counts two and three, and after the lower court had heard and denied a motion for new trial, final judgment was entered for the defendant, from which this appeal was taken.

The defendant-appellee was engaged to build a section of the

Jones Falls Expressway in Baltimore County, as general contractor under a contract with the State Roads Commission of Maryland (S.R.C.). For a period of time prior to March 13, 1962, pursuant to its contract, Williams had been making substantial changes in the grade and elevation of the property immediately adjacent to the property of appellant. Before appellee started its work, the land to the north of appellant's was a valley or a meadow bottom. By March 13, 1962, appellee had constructed a huge fill to support the expressway at this location, which was some fifty feet high and three hundred ninety feet wide at the base.

Appellant's property was improved by a large building in which a bleach and dye works had been operated for many years. It is similar to a large commercial laundry, in that it takes its customers' yard goods or material—usually of cotton — which comes to it in a raw state after weaving, and processes them. The goods are purified and cleansed, the coloring matter or other impurities are removed, and the cotton is then starched or dyed for use by the subsequent manufacturer. Appellant's plant operation is thus essentially a service organization, which owns no goods but which charges for processing the goods of others on a per yard basis. Every operation in the various processes undertaken by appellant, except the stitching of the goods at the outset, and the packing at the end of the line, uses considerable amounts of water. In March of 1962, six hundred thousand to seven hundred fifty thousand gallons of water per day were being used in the regular course of appellant's business.

The principal source of this water was a reservoir owned by appellant which was located on its own property just at the toe of the huge slope or fill, which appellee had constructed adjacent thereto. This supply was supplemented by wells, and to a very small degree, by city water. The reservoir had always been fed by a millrace or stream entering it from the northwest, which supply was channeled into a thirty-six inch pipe constructed by Williams before it began to construct the fill, so as to preserve the water supply to the reservoir. One of the special provisions of the contract with S.R.C. for the project, introduced into evidence as plaintiff's exhibit No. 17, called par-

ticular attention to the fact that this millrace was a source of water supply to the appellant's plant, and specifically provided that "water flow must be maintained at all times." Appellee's superintendent, being aware of the extreme importance of this matter, conferred with appellant's superintendent about it before appellee began laying the thirty-six inch pipe.

From the reservoir, which was higher in elevation than the plant, the water came by gravity through two outlets—a ten inch pipe and a six inch pipe—and then joined with pipe lines coming from the wells, which, in turn, entered the plant. Not only was the reservoir used as the principal source of water for the plant, but, being higher in elevation, it also acted as a source of pressure on the water coming from the wells, so as to enable that water to enter the plant under sufficient pressure to reach the processing machines. If the reservoir were empty or clogged with mud or debris, the natural pressure on the well water would be insufficient to bring it into the plant at a usable pressure. A combination of water available from the city water line and the wells, without the pressure from the reservoir, was insufficient to allow normal operation of the plant.

On the night of March 12, 1962, a heavy rainstorm occurred. The banks of the fill were eroded, water came from the cut section, off a hillside, and washed down the slope of the fill, and silt, mud, debris and water subsided or slid onto appellant's land and into its reservoir, filling it—there was no free flowing water left in it. Before the trial began appellee admitted that the mud and debris which filled the reservoir came from the cut and fill recently constructed by it adjoining the reservoir. During the trial appellee's superintendent on the job also admitted that "it wasn't unusual to have erosion or a small slide take place in a fill that was placed by equipment * * *," that it was usual for fills to erode and cuts to drain, and that "you get that condition most times in the spring, towards the spring of the year when you have hard rains."

The specifications, which were a part of the contract between S.R.C. and appellee for the work, plaintiff's exhibit No. 16, provided in pertinent parts:

"Section 10.05-14 Maintenance of Work, During Construction

"The Contractor shall maintain the work during construction and until final acceptance. This maintenance shall constitute continuous and effective work prosecuted as required with adequate equipment and forces to the end that the roadbed, or structures, are kept in satisfactory condition at all times.

"Particular attention shall be given to drainage, both permanent and temporary. The Contractor shall use all possible precautionary measures to avoid damage or loss that might result from accumulations and concentrations of drainage waters, and material carried by such waters and such drainage shall be diverted or dispersed when necessary to prevent damage to excavation, embankments, surfacing, structures or property.

\* \* \*

"Section 10.07-15 Preservation and Restoration of Property, Trees, Monuments, Etc.

\* \* \*

"2. The Contractor shall be responsible for all damage or injury to property of any character during the prosecution of the work, resulting from an act, omission, neglect or misconduct in his manner or method of executing said work satisfactorily, or due to his non-execution of said work, or at any time due to defective work or materials, and said responsibility shall not be released until the work shall have been completed and accepted. When or where any direct or indirect damage or injury is done to public or private property by or on account of any act, omission, neglect or misconduct in the execution of the work or in consequence of the non-execution thereof on the part of the Contractor, he shall restore, at his own expense, such property to a condition similar or equal to that existing before such damage or injury was done, by repairing, rebuilding, or otherwise restoring as may be directed, or he shall make good such damage or injury, in an acceptable manner. \* \* \*

\* \* \*

"Section 10.07-20 Contractor's Responsibility for Work

"Except as herein elsewhere provided, until final acceptance of the work by the Engineer, the Contractor shall have the charge and care thereof and shall take every precaution against injury or damage to any part thereof by the action of the elements, or from any other cause, whether arising from the execution or from the non-execution of the work. \* \* \*"

The superintendent for the defendant-appellee admitted that it had taken no special precautions to prevent the earth from the fill or cut from draining or sliding into the reservoir but had merely followed the engineering design given to it by the S.R.C. More specifically appellee did not shore, brace, sod, cover with concrete, or otherwise support the newly formed grade of the expressway, nor were gutters or culverts constructed at the base to accommodate surface water. After the occurrence on March 12, the appellee on orders from the S.R.C. removed the mud and soil from the reservoir and constructed a concrete swale to carry drainage around the reservoir, and the newly formed banks of the fill were sodded or seeded. Mr. Richard H. Trainor, the State Roads Commission's project engineer, testified that in order to build the concrete swale it was necessary to acquire additional property but that this was the only "practical" way of averting consequences of such a mud slide. He further testified that prior to the March incident the S.R.C. would not have approved plans to build such a swale if Williams had chosen to take such a precautionary measure. Trainor later admitted that there were a "lot of things" which could have been done which would have accomplished the same results, *i.e.*, averting the mud slide, but presumably they would not have been "practical" in his view.

The effect of the filling of the reservoir with the mud and silt from the banks of the adjoining cut and fill was to block the inlet into the reservoir through the thirty-six inch pipe from the millrace, and at the other end of the reservoir, to block the ten and six inch outlet pipes to the plant. Muddy water entered the plant's water system until the valves could be shut, and then all water from the reservoir stopped, and the in-plant

water supply, because of the absence of the water and the pressure from the reservoir, fell below the amount required to continue normal operations and production was curtailed for a full week, resulting in substantial damage to appellant's business.

The facts which have thus far been set forth give rise to count one, alleging trespass, and count two alleging trespass on the case in the plaintiff's declaration.

On April 19, 1962, appellee's men were working with a backhoe, digging a trench for the swale, when they dug across appellant's property and, with the backhoe, broke the six-inch pipe leading from the reservoir to the plant, again cutting off the water supply from the reservoir, causing the plant operations to be curtailed for approximately another week, and resulting in further damage to the appellant's business.

Appellee's superintendent admitted he knew of the existence of the pipe but not the specific location thereof. Nevertheless, without making any additional inquiry the appellee's employees relied upon and followed a line staked out by the engineer from the S.R.C. An employee of the S.R.C. testified that inquiry had been made of Mr. Ralph Ault, plant engineer and maintenance superintendent of Rockland, as to the pipe's exact location, but after Ault was unable to provide this information they proceeded on the erroneous assumption that the water pipes ran in a straight line from the reservoir to the plant.

The facts relating to the incident of April 19 are the basis for the plaintiff-appellant's third count in its declaration claiming damages based upon appellee's negligence in breaking the pipe.

The causes of action came to trial in May of 1964, before Judge Menchine and a jury. In the course of that trial appellee's attorney, on the record in open court, admitted liability for the April 1962 incident covered by count three of the declaration. However, because of an inadvertent allusion to insurance coverage which was thereafter made in the course of the trial, the lower court granted appellee's motion for a mistrial. After eight months, during which no amendments or changes were made in the pleadings, the case again came to trial before a jury on January 26, 1965.

As indicated in the beginning of this opinion, at the conclusion of plaintiff's case, the lower court granted defendant's motion for a directed verdict on count one. Before the close of defendant's case, the lower court denied a motion by plaintiff to amend its declaration to add a fourth count asserting trespass with respect to the pipe breaking incident of April 1962, and at the conclusion of the whole case, denied plaintiff's motion for a directed verdict in its favor on count three. At the conclusion of the trial, which lasted for six trial days, and after final arguments had been made, the jury, before retiring to consider its verdict, requested the exhibits in the case. The court refused to allow plaintiff's exhibits 16 and 17, the contract specifications and proposal form, or specifically tendered excerpts therefrom, to go to the jury along with the other exhibits in the case.

On this appeal the appellant poses five questions, which are:

I. Did the trial court err in directing a verdict at the close of the plaintiff's case in favor of the defendant on count one of the declaration, which alleged that a trespass had occurred in March of 1962;

II. Did it err in refusing to allow excerpts from plaintiff's exhibits 16 and 17, the contract specifications and proposal form, pursuant to which appellee was to perform its work, to go to the jury room;

III. Did it correctly refuse to direct a verdict in favor of the plaintiff on count three of the declaration;

IV. Did the trial court properly deny plaintiff's motion to amend the declaration to add a fourth count asserting trespass with respect to the pipe breaking incident in April 1962; and

V. Did it err in denying plaintiff's motion for a new trial under all the facts and circumstances of this case.

*I*

The first question raised is whether the trial judge erred in granting defendant-appellee's motion for a directed verdict as to count one which, it will be recalled, sounded in trespass. At the time that motion was granted, before defendant had put on its case, Judge Menchine stated:

"The motion of the defendant that relates itself to Count 1 of the declaration which the Court regards as

a trespass count is granted for the reason that it is the view of the Court that there is no showing in the case that there was an entry upon the plaintiff's property by the defendant, its agents, servants and employees; nor a showing that the defendants are the owners of the property adjoining the property of the plaintiffs, and, therefore, there has been no showing in the mind of the Court of a trespass by the defendant upon the land of the plaintiff, and the motion will be granted."

Later in the court's memorandum opinion denying a motion for new trial the trial judge said: "[T]he Court has a firm conviction that the Defendant Corporation does not bear either the relationship to the adjoining property or such *control* over its exploitation for road purposes as would submit to it liability under a trespass theory." (Emphasis added.)

There is no requirement under the law of this State, in order for an action in trespass to lie, that the trespasser own or have control (in the sense of being a possessor) of land adjacent to that trespassed upon. In the federal case of *Whitehall Const. Co. v. Washington Sub. San. Comm'n,* 165 F. Supp. 730, 732 (D. Md. 1958), Judge Watkins, applying the Maryland law used the following language which is also apposite here:

"The court knows of no case, nor has counsel called the court's attention to any case, holding that an essential element of a cause of action for trespass or nuisance is ownership by the alleged tortfeasor of, or control over, land contiguous to the land invaded by the tortfeasor. While such ownership or control may often factually exist, and this is especially true where the tortious interference with an interest in land is occasioned by acts done on the adjacent land which result in an entry or invasion by an inanimate or intangible object rather than a living being, in either case it is the interference by the defendant with the plaintiff's interest in the plaintiff's exclusive possession of the invaded land or in the plaintiff's use and enjoyment of such land that constitutes the actionable wrong."

Although the appellee does not dispute the correctness of the above quoted portion of Judge Watkins' opinion, it is its position that "the critical question under Maryland law is whether, with or without fault, appellee controlled the act which directly caused the invasion." Under this test, the appellee asserts that Judge Menchine was correct in granting the directed verdict on the first count of the declaration, because, it is argued, the Williams Construction Company did not have control over the drainage from the fill and cut inasmuch as it had to follow the drainage plans of the engineer of the S.R.C., and that the absence of an effective drainage plan was the cause of the injury suffered. In asserting this test of *control* the appellee relies on the Maryland case of *Toy v. Atlantic Etc. Co.,* 176 Md. 197, 4 A. 2d 757 (1939). In *Toy* the defendant contracted with the federal government to dredge a portion of the Chesapeake and Delaware Canal and deposit the dredged material on property owned by the government. The defendant contractor agreed to construct all embankments necessary, *in the opinion of the government representative,* for confining and grading the material, with necessary sluices and drainage ditches, and all the dredged material was deposited under federal control and in accordance with definite specifications. In that case an embankment gave way and mud and debris slid into navigable waters near the plaintiff's property, injuring the plaintiff in his business. There an action was brought for *trespass on the case* and a verdict was directed in favor of the defendant contractor when the court refused to apply res ipsa loquitur or the doctrine of strict liability as laid down in *Rylands v. Fletcher,* (1866), L.R. 1 Ex. 265, 279, aff'd 1868, L.R. 3 H.L. 330; and our predecessors in *Toy* noted that the premises from which the dredged material had escaped were neither owned by nor under the *exclusive* control of the defendant contractor, which they deemed to be relevant in the application of the above mentioned doctrines. But in that case, this Court further noted at page 205 of 176 Md. that an action for *trespass* would not lie because the plaintiffs' land, unlike that in the instant case, was not physically invaded by the mud and debris. The present appellee cited no case, Maryland or otherwise, which stands for the proposition, here advocated, that exclusive control over the

adjacent land or over the invading force is an essential element in order for an action for *trespass* to lie, and we do not think it is a necessary element.

However, when an adjacent property is invaded by an inanimate or intangible object it is obvious that the defendant must have some connection with or some control over that object in order for an action in trespass to be successful against him. In the instant case the appellee had very significant amounts of control over the adjoining land, including that which was later to become the invading mud and debris. It was the appellee who changed the landscape by digging out the cut and placing the fill material from which the mud and debris were carried by the foreseeable seasonal rains. The only element which defendant-appellee argues lessens the exclusiveness of that control, was the fact that it was contractually bound to follow the plans and specifications of the S.R.C. But from a reading of those contract specifications, particularly Section 10.05-14 which directs the contractor to use "all possible precautionary measures to avoid damage or loss that might result from accumulations and concentrations of drainage waters, * * *" it becomes apparent that the contractor was to do more than merely blindly follow the plans and specifications in regard to drainage of surface waters. Unlike the situation in *Toy* where the contractor had agreed to do all that was necessary in the opinion of the government, here the specifications called for the appellee to independently take all precautionary means to avert harm caused by the flow of drainage waters. The appellee contends that the only possible precautionary measure which it could have taken was to construct a concrete swale which required the cooperation of the S.R.C. in acquiring the needed adjoining property. In making this argument the appellee relies on the testimony of Trainor, project engineer of the S.R.C., who testified that the concrete swale was the only possible precautionary measure which would have averted the consequences of the deluge and the S.R.C. would not have granted permission to build such a swale if permission had been requested prior to the heavy rainfall of March 12, 1962. One difficulty which results from relying on Trainor's testimony in order to show the propriety of the lower court's grant of the directed

verdict in defendant's favor as to trespass at the conclusion of plaintiff's case, is that that testimony came into evidence after the verdict had been directed, since Trainor was a witness called by the defendant and not the plaintiff. But even had Trainor's testimony been before the court at the time the verdict was directed, his testimony was not without inconsistencies inasmuch as he went on to testify that there were actually many other precautions which could have been taken, but were not, which would have had the same effect as the swale. In Trainor's opinion these unnamed "other precautions" would have been "not practical" but since the precautions would have the desired results their suggested impracticability must have been founded on cost or other considerations not mentioned in the specifications. Such other precautions could have been taken without the consent of the project engineer of the S.R.C. because one of the specifications for the job (Sec. 10.05-14) was a direction that they should be taken.

As to the asserted lack of control, the appellant also stresses the fact that the S.R.C. had their project engineer on the work site in order to see that the cut and fill were being constructed in compliance with the plans and specifications. However, the mere fact that the plans and specifications of another must be followed, and that the one who draws those specifications has a supervisor on the scene to see that they are complied with, is not a valid defense to an action of trespass. *Mullan v. Belbin,* 130 Md. 313, 323, 326, 100 Atl. 384. In *Mullan* an action was brought in both trespass and in trespass on the case against a subcontractor on a contract with the City of Baltimore, to excavate the bed of a highway. During the course of that work the defendant contractor's steam shovel dug too close to plaintiff's building, causing a wall thereof to collapse. There, one of the defendant subcontractor's defenses was that the work was being done under the supervision and direction of the city's engineer. At page 323 it was emphatically stated by this Court that: "The fact that the superintendent of the subcontractor followed the directions of the City Engineer would not justify an invasion of the plaintiff's property, * * *." Later, at page 326, the Court again said: "The liability of the defendant did not, as we have said, depend upon whether or not he followed the

instructions of the City Engineer, and the fact that he exercised reasonable care in operating the steam shovel would not relieve him from the consequences of an unlawful invasion of the plaintiff's property." If following the directions and instructions of the city engineer did not excuse the contractor in *Mullan,* following the design of the S.R.C. for the construction of the cut and fill while under the scrutiny of the project engineer of the S.R.C. should likewise not excuse the appellee's trespass here.

While the trial judge did not give it as one of his reasons below, the appellee also suggests that this directed verdict was justified as to count one because the invasion was not direct enough, *i.e.,* it was not drainage water *per se,* but the movement of the land by the drainage, which caused the injury and thus an action for trespass would not lie. In our view this distinction is without merit since the trespass here is similar to that present in the case of *Cahill v. Baltimore City,* 93 Md. 233, 48 Atl. 705. There the plaintiff's property abutted a street which the municipal defendant had altered by changing the grade and installing new drains. The result of these changes was that surface water accompanied by large quantities of mud and other debris invaded the plaintiff's property and this Court held that an action in trespass would lie. In the case of *Guest v. Church Hill,* 90 Md. 689, 693, 45 Atl. 882, which is virtually identical with the *Cahill* case, and in which the drainage which was precipitated onto the plaintiff's property was accompanied by "dirt and filth," this Court said, at page 693 :

"If * * * by the elevation and improvement of its streets and the construction of artificial gutters and drains a municipal corporation divert the surface-water of a considerable territory from its natural flow and throw it upon an abutting lot or collect it in volume on the street in front of the lot whence it cannot escape except by flowing over the lot, the better authorities agree that such action amounts to an invasion of the premises and renders the corporation liable for the injury caused thereby, * * *."

It is our view that the trial judge erred in directing a verdict for the defendant as to count one inasmuch as the plaintiff

had made out a prima facie case of trespass. Since the verdict was directed as to this count before the defendant had an opportunity to put on its defense, a new trial as to both liability and damages for trespass must be granted. It may well be that in the light of the applicable law delineated thus far in this opinion, plus the binding admissions made by the defendant-appellee before trial, and read into evidence at the beginning of plaintiff's case,[1] that the parties would wish to avoid the expense of a new trial as to liability and proceed only as to damages. We can not, however, as the plaintiff-appellant suggests, enter a verdict on this count in its favor since none was asked in the court below.

## II

The second question raised by the appellant is whether the trial judge committed reversible error in not allowing certain portions of plaintiff's exhibits 16 and 17 to go to the jury room. The reason Judge Menchine gave for this disallowance was that the excerpts from the specifications and proposal form were, in his opinion, not in evidence. While both parties agree that they were in evidence (those portions set forth earlier in this opinion), the appellee contends, *inter alia,* that at the time the jury requested all exhibits, the trial judge could not have allowed the excerpts to go to the jury because of the uncertainty as to the exact portions of those exhibits the plaintiff-appellant wanted the jury to see. The appellant contends that the excerpts were specific and known to the trial judge at the time of the disallowance, that the disallowance was prejudicial, and that consequently a new trial as to the negligence set out in count two is required. We agree with the appellant.

---

1. The admissions, here relevant, were (a) that prior to March 13, 1962, by reason of the changes made by defendant in the grade and elevation of the property adjoining plaintiff's, and the work being carried on otherwise by the defendant at said location, quantities of mud and soil were caused to subside onto plaintiff's land, and particularly into plaintiff's reservoir located thereon, and (b) that the defendant had contracted with the S.R.C. to perform the work in accordance with certain plans and specifications supplied to the defendant by the S.R.C.

### III

The third question raised on this appeal is whether the trial judge erred in failing to direct a verdict on count three which sounded in negligence and concerned the April pipe breaking incident. It is our view that the trial judge should have ruled, as a matter of law, that under the circumstances of this case reasonable men could not have disagreed that defendant-appellee was negligent in breaking plaintiff-appellant's water pipe.

Instead of directing a verdict on this matter the lower court instructed the jury that:

> "* * * if you believe that a reasonably prudent road construction contractor, knowing, under the circumstances, that a pipe was there, knowing under the circumstances, that its interruption would probably inflict harm or injury upon the plant, should have done more in the way of care with respect to the location of the pipe line than to assume that it ran in a straight line from one point to another, and you believe that a reasonably prudent constructor of roads would have caused it to undertake further investigations with respect to the nature of the place of its location and failed to do so, this, of course, would constitute negligence in Case Number 2."

At the time the directed verdict was requested the jury had before it the uncontradicted evidence that the defendant-appellee knew of the existence of the pipes from the reservoir to the plant and, because of their cleaning of the reservoir themselves, had actual notice of the position of those pipes in the reservoir and the function of those pipes with respect to the supply of water to the plant. Moreover, because of the March incident, they were completely aware of the vital importance of those pipes to the entire water supply system of the plant. Despite their knowledge of the existence and importance of the pipes, and their lack of knowledge of the exact location thereof, they simply followed a line which was laid out by men from the S.R.C. and made no independent effort whatsoever to locate the pipes before commencing backhoe operations in this area.

The following colloquy, between plaintiff's counsel and de-

fendant's superintendent of the project, reveals the lack of any initiative put forth by the defendant in this matter:

"Q. Did you make any attempt whatever to determine where it was before you put the backhoe in the area? A. No, but, again, we were digging a ditch which, again, was an extra, and that was not in the original contract, and the ditch was laid out by men from the State Roads Commission.

"Q. So you just followed that? A. Followed that.

"Q. And made no inquiry? A. Followed their line and assumed the line was a lot deeper than it was and at a different location, too.

"Q. So that was an assumption? A. That's right.

"Q. And that assumption was wrong? A. Yes.

"Q. Did you try to find out where the limits of Rockland's property was? A. Well, that, again, is taken care of by the State Roads Commission.

As to the line which was followed so readily by the defendant contractor without additional precautions of any kind, it turned out that this was a case of "the halt leading the blind." The expert engineer for the S.R.C., Mr. Trainor, testified as to the efforts of the S.R.C. as follows:

"Q. Now, in staking the line and the grade, what, if any, consideration * * * did you give, sir, to any water line that might run from the pond to the plant? A. Well, I talked to Mr. Ault on one occasion prior to staking, and he did not know the exact location of the lines. He did show me where the valves were in the back of the building, and we assumed that a line from the pond, where the pond had been empty—I knew where the two inlets were for the pipes, and I wrongly assumed it was a straight line.

"Q. You wrongly assumed that the pipe line from the pond to the valve was a straight line? A. Yes, sir."

However, whether the S.R.C.'s line was based on an erroneous assumption or not, we hold that it does not relieve the defendant-appellee from liability for negligence. The lower

court should have ruled that the contractor was negligent in using its backhoe on plaintiff's land without making some independent inquiry as to the location of the pipes and without making some initial inquiry as to the limits of appellant's land. In view of the clear foreseeability of the harm which might, and in fact did, occur as the result of such conduct, defendant-appellee was negligent as a matter of law, a verdict should have been directed on count three as to liability, and damages caused by the negligent pipe breaking were the only matters properly remaining for consideration by the jury. Accordingly the ruling of the trial court refusing to grant appellant's motion for a directed verdict on count three is reversed and a directed verdict is granted as to liability on that count so that on remand a new trial may be had as to damages only.

## IV

The fourth question raised here is whether the trial judge abused his discretion in failing to allow an amendment for a fourth count, sounding in trespass, based upon the pipe breaking incident of April 1962. In the light of what we have said in part III of this opinion, we need not decide this question. The proposed trespass count was based on the same facts as those alleged and proven under the negligence count and inasmuch as the damages recoverable for the trespass, under the circumstances of this case, could be no greater than those recoverable under the negligence count, no useful purpose would be served by allowance of the amendment.

## V

Since we are remanding this case for an ascertainment of damages under count three and for a new trial as to both liability and damages for the matters alleged in counts one and two, we do not reach the fifth question here presented, *i.e.,* whether the trial court abused its discretion in failing to grant a new trial.

*Judgment reversed and case remanded for new trial not inconsistent with this opinion. Costs to be paid by appellee.*