642 A.2d 180

Thomas ROSENBLATT

v.

EXXON COMPANY, U.S.A. et al.

No. 137, Sept. Term, 1993.

Court of Appeals of Maryland.

June 6, 1994.

G. Macy Nelson (Jacqueline S. Russell, Anderson, Coe & King, all on brief), Baltimore, for appellant.

John E. Griffith, Jr. (Ann Burke Lloyd, Piper & Marbury, both on brief), Baltimore, Daniel P. Rigterink (Bregman, Berbert & Schwartz, all on brief), Bethesda, for appellees.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

MURPHY, Chief Judge.

This case involves the question whether, under Maryland law, a subsequent occupier of commercial property has a cause of action in strict liability, negligence, trespass, or nuisance,

for economic losses sustained, against a former occupant whose activities during its occupancy allegedly caused the property to become contaminated by toxic chemicals.

## I

In July 1986, Thomas Rosenblatt leased a parcel of real property located in Prince George's County, Maryland, from its owner, Earl Wenger. The lease agreement contained the language that Rosenblatt was accepting the property "as is." Rosenblatt planned to open and operate a "Grease–N–Go" automotive quick lubrication business on the property. Rosenblatt's rental payments were contingent upon his obtaining a special exception to permit the operation of the business and a building permit for construction.

The previous tenant, Exxon Company, U.S.A., had leased the property from 1951 to 1985, and had subleased the property during that period to various independent dealers for use as a gasoline station.[1] In 1951, Exxon[2] had installed gasoline storage tanks on the property; the tanks remained on the property until 1985, when Exxon's lease was terminated.

In preparing for the construction of his "Grease–N–Go" facility, Rosenblatt hired ATEC Environmental Consultants (ATEC) to perform a geotechnical study of the property to identify potential construction problems. In ATEC's initial report, dated January 30, 1987, it noted the presence of a "very strong" hydrocarbon odor in soil and groundwater samples, and it recommended that a separate environmental study be performed to determine whether hydrocarbon contamination was present.

---

1. Among these independent dealers were James Flaherty (1973–80), Brad Savard (1980–82), and Han Suk Kwak and Ji Whan Lee (1984–85), who, in addition to Exxon, were all named as defendants in Rosenblatt's amended complaint.

2. Exxon was formerly known as "Esso Standard Oil Company" and "Humble Oil and Refining Company."

In May 1988, the special exception was granted, and in October 1988, Rosenblatt began paying rent on the property. In January 1989, Rosenblatt notified Exxon of the possible contamination. Exxon responded to Rosenblatt by letter dated February 9, 1989, stating that the ATEC report was a geotechnical report rather than an environmental report, that there was "no factual basis" to believe that there was contamination, and that it "had no further responsibility at this time."

Rosenblatt thereafter requested that ATEC complete an environmental assessment of the property. In March 1989, ATEC conducted a study and found extensive petroleum contamination of the soil and groundwater on the property, specifically benzene, a known carcinogen, and other toxic substances.

As a result of this discovery, the Maryland Department of the Environment was notified, conducted an investigation, and issued a Notice of Violation, advising that the contamination constituted a violation of Maryland law, and requiring Exxon to perform a hydrogeological study of the property. Exxon commenced its study in May 1989, and thereafter undertook a remediation of the property. The State's Hazardous and Solid Waste Management Administration informed Rosenblatt and Wenger that construction efforts could continue but would have to be coordinated with Exxon's remediation efforts.

In January 1990, Rosenblatt filed suit against Exxon in the Circuit Court for Prince George's County, seeking economic damages, including expenses incurred as a result of the contamination and lost future profits from his planned business.[3] His complaint included counts of negligence, strict liability, trespass, nuisance, and other counts not here at issue.

---

3.  Wenger, the owner of the property, was originally also a plaintiff, but subsequently settled his case against Exxon; his claim was dismissed, with prejudice. Additionally, Rosenblatt, after filing the initial complaint with Wenger as co-plaintiff, had filed a "cross claim" against Wenger; the claim was dismissed on procedural grounds, without prejudice. Rosenblatt also had named as a defendant Charles Wenger, the landlord's son, who was also one of the station operators; this claim was dismissed as well.

Shortly thereafter, in March 1990, Rosenblatt was informed by the bank to which he had applied for financing that it would not finance the "Grease–N–Go" project, in part because of the environmental condition of the property. Without this financing, Rosenblatt was unable to start his business.

In April 1990, the case was removed to the United States District Court for the District of Maryland, where Exxon filed a motion for summary judgment on all counts. Rosenblatt filed a motion to amend his complaint to include as defendants the independent service station operators. The court (Hargrove, J.) granted Exxon partial summary judgment on the counts not here at issue, and granted Rosenblatt's motion to amend.

On August 14, 1991, the federal court remanded the remaining counts of negligence, strict liability, trespass, and nuisance against Exxon and the independent operators to the circuit court. Exxon and two of the operators, Flaherty and Savard, filed motions for summary judgment in the circuit court on the remaining counts. On July 13, 1993, the court (Woods, J.) granted the motions, stating that Maryland law does not provide tenants of commercial property with a cause of action based upon negligence, strict liability, trespass or nuisance against previous tenants of the property. The court stated that these tort claims were available only to occupants of neighboring land or others to whom a duty was owed by the defendant. Thereafter, the court entered an order granting summary judgment to the remaining two defendants, Kwak and Lee, who were pro se, and final judgment in favor of all defendants.

Rosenblatt appealed to the Court of Special Appeals. We granted certiorari prior to review by the intermediate appellate court to consider the issues presented in this appeal.

## II

Rosenblatt argues that an occupier of land should have a cause of action in strict liability against a prior occupier whose abnormally dangerous activity contaminated the land. He

acknowledges that this principle has heretofore been applied in Maryland to actions by occupants of neighboring land, rather than subsequent occupiers of the same land. He argues, however, that the policies underlying the strict liability principles support their extension to the instant case. He observes that courts in two other jurisdictions have held that subsequent occupiers may sue under a theory of strict liability and urges that Maryland join those jurisdictions.

Rosenblatt contends that the transport, storage and dispensing of gasoline constitute abnormally dangerous activities. He urges that Exxon, as an enterprise engaging in such activities, should bear the risk of harm resulting therefrom. Exxon's liability, he asserts, should not be limited to adjacent property owners. He suggests that although Exxon and Rosenblatt were not neighbors geographically, they were "neighbors in time." He urges that it "makes no sense" to allow a geographic neighbor of the affected property to maintain a strict liability cause of action, but not to allow one who subsequently comes into possession of the contaminated property to do so. He suggests that a restriction on the doctrine of strict liability to claims involving neighboring landholders would serve to exonerate tenants who have contaminated a property and then moved on.

He argues further that a cause of action in negligence should also be available to the subsequent occupier of contaminated land. He says that a subsequent occupier of contaminated land is owed a tort duty by a prior occupier because it is foreseeable that contamination from the activities of a prior occupant will harm subsequent occupants. Because Exxon was a lessee, he contends that it was foreseeable to the company that a subsequent lessee would be harmed by Exxon's failure to exercise care in the conduct of its business. Moreover, he suggests that Exxon, because it is in the business of producing, handling, storing and marketing petroleum products, should be held to a high degree of care in conducting its business. He maintains that Exxon was aware of the risk of petroleum products leaking from underground storage tanks and was also aware that measures could be taken to

reduce the risk of leakage. Thus, he concludes, it owed a duty to Rosenblatt to prevent such harm.

Rosenblatt asserts that a subsequent possessor of land may also bring a claim of trespass against a prior occupant of the same land. He maintains that when a prior occupant creates a condition on land that interferes with the subsequent occupant's interest and exclusive possession of the land, there is a trespass. He contends that there is no requirement that the property be in the possession of another at the time of creation of the condition. He claims that when property changes hands, but the presence of contamination placed there by the former occupant continues so that it invades a new possessor's interest, a continuing trespass has occurred. He asserts that by causing hydrocarbon contamination of the property, Exxon has interfered with Rosenblatt's interest in the exclusive possession of his land and thus is liable for a continuing trespass.

Moreover, Rosenblatt contends that a subsequent occupant of contaminated land has a cause of action in nuisance against a prior occupant whose contamination of the property interferes with the subsequent occupant's interest in the private use and enjoyment of the property. He argues that the nuisance doctrine is not limited to interference with an adjacent landowner's use of land, but should be extended to an occupant of land previously occupied by the one who created the damage.

Exxon and the independent operators (collectively Exxon) aver that causes of action traditionally available only to geographical neighbors should not be extended to subsequent occupants of property. Exxon argues that, unlike a contemporary occupier of land, a subsequent occupant can avoid harm simply by investigating prior to occupying the land.

As to the strict liability claim, Exxon argues that the doctrine of abnormally dangerous activities is designed not to protect the actor's own property but the property of its neighbors, who cannot avoid the harm resulting from the activity. It maintains that Maryland law has applied the

doctrine of strict liability only in situations where something on someone's land escapes to the land of another, rather than onto one's own land.

With regard to the negligence claim, Exxon argues that it owed no duty to Rosenblatt because there was no relationship between Exxon and Rosenblatt. It states that courts from other jurisdictions have specifically declined to create such a duty based upon the absence of foreseeability. It asserts that the doctrine of caveat emptor places the risk of defects in the land upon the prospective tenant, particularly where, as here, the tenant enters into an "as is" lease.

With regard to the trespass issue, Exxon contends that trespass is concerned only with the rights and obligations of occupiers of adjoining land. For a continuing trespass to occur, it says that there must be an original tortious placing of something on the land of another.

And finally, as to the claim of nuisance, Exxon states that private nuisance, like trespass, is a cause of action involving conflicts between neighboring contemporaneous landowners and that Maryland's application of these tort principles excludes nuisance claims between tenants of the same property.

Exxon concludes by stating that the extension of the above tort causes of action to the instant case would be contrary to sound public policy because it would vitiate contract principles, create uncertainty, and interfere with the market's allocation of resources and risks. It urges that to allow recovery in the instant case would, in effect, create a claim in perpetuity. It contends further that it is unnecessary to allow these actions, particularly where there is an involved regulatory scheme relating to the underground storage of gasoline and related activities, thus assuring that a possessor of land will never have complete license to pollute the land.

### III

Summary judgment is properly granted if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Maryland Rule 2–

501; *Keesling v. State,* 288 Md. 579, 583, 420 A.2d 261 (1980). The standard to be applied in reviewing a trial court's grant of summary judgment is whether the court was legally correct; when granting summary judgment, the trial court decides issues of law, not fact. *Decoster v. Westinghouse,* 333 Md. 245, 261, 634 A.2d 1330 (1993); *Rosenberg v. Helinski,* 328 Md. 664, 674, 616 A.2d 866 (1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 3041, 125 L.Ed.2d 727 (1993); *Heat & Power v. Air Products,* 320 Md. 584, 591–92, 578 A.2d 1202 (1990).

We here determine whether the trial court was legally correct in concluding that Exxon was entitled to judgment as a matter of law on Rosenblatt's strict liability, negligence, trespass and nuisance claims.

## A

### *The Strict Liability Claim*

We have long recognized the doctrine of strict liability, derived from the rule of *Rylands v. Fletcher.*[4] *See Baltimore Breweries Co. v. Ranstead,* 78 Md. 501, 28 A. 273, 27 L.R.A. 294 (1894); *Susquehanna Fertilizer Co. v. Malone,* 73 Md. 268, 20 A. 900, 25 Am.St.Rep. 595 (1890). The rule enunciated in *Rylands* provided that "the person who, for his own purposes, brings in his lands and collects and keeps there anything likely to do mischief if it escapes must keep it in at his peril; and if he does not do so, is prima facie answerable for all the damage which is the natural consequence of its escape." *Fletcher v. Rylands,* L.R. 1 Ex. 265, 279 (1866). *Rylands* involved damage to the plaintiff's coal mine resulting from the escape of water from the defendant's reservoir.

We adopted the modern version of the strict liability doctrine in *Yommer v. McKenzie,* 255 Md. 220, 257 A.2d 138 (1969). We therein adopted the definition set forth in § 519 of the Restatement (Second) of Torts (1965). Section 519 pro-

---

**4.** *Fletcher v. Rylands,* 3 H. & C. 774, 159 Eng.Rep. 737 (1865); *rev'd* in *Fletcher v. Rylands,* L.R. 1 Ex. 265 (1866); *aff'd* in *Rylands v. Fletcher,* L.R. 3 H.L. 330 (1868).

vides that "one who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm." Unlike the rule first enunciated in *Rylands,* this definition does not limit applicable activities to those causing an "escape" of something onto the land of another; it requires only that there be harm to the person or property of another resulting from the abnormally dangerous activity.[5]

In *Yommer,* an owner of residential property brought a claim against the owners of a gasoline station immediately adjacent to the residential property after gasoline leaked into the property owner's well. We there held that the doctrine of strict liability applied because, while "the operation of a gasoline station [did] not of itself involve 'a high degree of risk of some harm to the person, land or chattels of others,' the placing of a large underground gasoline tank in close proximity to the appellees' residence and well ... involve[d] such a risk, since it [was] not a matter of common usage." 255 Md. at 224–25, 257 A.2d 138. We stated that the most crucial factor in determining whether an activity was abnormally dangerous was the "appropriateness of the activity" to the place in which it was carried on. *Id.* at 225, 257 A.2d 138. We noted that the distinction between "natural" and "non-natural" uses served to limit the application of the rule, a limitation that was necessary to avoid unduly burdening landowners. We quoted from *Toy v. Atlantic Gulf & Pacific Co.,* 176 Md. 197, 212–13, 4 A.2d 757 (1939), where we stated the circumstances in which the rule of *Rylands* would be applied:

"The measure of duty thus imposed on the occupier of premises made him practically an insurer of his neighbors from such damage, and neither the absence of negligence on the part of the occupier nor the precaution taken was material to his liability. If carried to its logical consequences, the rule would impose grievous burdens as incident

---

.**5.** Section 520 provides factors to be considered in determining whether an activity is abnormally dangerous.

to the ownership of land, and therefore the courts have strictly limited the application of the rule. The basic concept underlying the rule is that a person who elects to keep or bring upon his land something which exposes the adjacent land or its owner or occupant to an added danger should be obliged to prevent its doing damage. So, it follows that if the escape be of oil, gas, electricity, explosives, sewage or water artificially accumulated and stored and damage is done to an adjacent property, the occupier is within the rule."

In *Toy*, we declined to extend the abnormally dangerous activity doctrine to situations in which the alleged tortfeasor was not the owner or occupier of land. *Id.* at 213, 4 A.2d 757. In that case, the defendant was a contractor who was dredging a canal and disposing of dredged material on government land which was adjacent to the plaintiffs' land. The plaintiffs brought suit when an embankment, constructed by the government to confine the excavated material, collapsed, causing a large mass of earth to obstruct a channel which provided plaintiffs access to their land by boat. We stated that because the defendant had no right of ownership or control of the site, its liability was limited to negligence, and could not be enlarged, under the circumstances, to a liability without fault. *Id.* at 213–14, 4 A.2d 757.

We similarly limited the doctrine in *Kelley v. R.G. Industries, Inc.*, 304 Md. 124, 497 A.2d 1143 (1985), holding that it was not applicable to hold the manufacturer or marketer of a handgun liable to a person injured by the handgun during the course of a crime. We said:

"The thrust of the doctrine is that the activity be abnormally dangerous in relation to the area where it occurs. If a gasoline station owner has faulty tanks which leak gasoline into the underground water supply, that might be abnormally dangerous if the land in which the tanks are buried is located in a well populated area. In such a situation, the hazard bears a relation to the occupation and location of the land on which the activity occurs. The dangers inherent in the use of a handgun in the commission of a crime, on the

other hand, bear no relation to any occupation or ownership of land. Therefore, the abnormally dangerous activity doctrine does not apply to the manufacture or marketing of handguns." 304 Md. at 133, 497 A.2d 1143 (citations omitted).

Thus, we have applied the doctrine only to claims by an occupier of land harmed by an activity abnormally dangerous in relation to the area, which is carried on by a contemporaneous occupier of neighboring land.

We are here asked to expand the application of this doctrine to claims by subsequent occupants of the land on which the dangerous activity took place. Rosenblatt relies primarily upon cases from two jurisdictions where recovery was allowed under a strict liability theory to subsequent occupiers of property contaminated by a previous occupant.

In *T & E Industries v. Safety Light Corp.*, 123 N.J. 371, 587 A.2d 1249 (1991), the New Jersey Supreme Court held that a subsequent occupier of property could maintain an action for strict liability against its predecessor who dumped radium on a portion of the property. The property had changed hands several times before T & E leased and eventually purchased the land. The court focused upon the dangerousness and inappropriateness of the activity, stating that those who, for their own benefit, introduce an extraordinary risk of harm to the community should bear the risk. 587 A.2d at 1257. The court concluded that this policy consideration justified the broadening of the doctrine's application beyond the claims of adjacent landowners. *Id.* Similarly, in *Prospect Industries Corp. v. Singer Co.*, 238 N.J.Super. 394, 569 A.2d 908 (1989), the Superior Court granted summary judgment on the plaintiff's strict liability count against the prior owner, whose equipment had leaked toxic wastes, causing the property to become contaminated. The court held that this leakage constituted an abnormally dangerous activity for which the prior owner should be held responsible. 569 A.2d at 911. Both of these New Jersey courts held that the fact that the purchasers agreed to take the property "as is" did not affect the sellers'

strict liability because there was no evidence that the purchasers were aware of the contamination when they entered into the contracts, and a party ignorant of the presence of an abnormally dangerous condition could not be held to have assumed the risk posed by the condition. 587 A.2d at 1259; 569 A.2d at 912.

In *Hanlin Group v. Intern. Minerals & Chemical Corp.*, 759 F.Supp. 925 (D.Me.1990), the court held that a strict liability claim could be asserted against a prior owner who engaged in abnormally dangerous activities, namely, the disposal of hazardous chemicals, including mercury and carbon tetrachloride, on the property. The *Hanlin* court reasoned that it was not necessary for the plaintiff to prove negligence where the activity carried out by the defendant was an abnormally dangerous activity. *Id.* at 933. The court distinguished the disposal of hazardous chemicals from other activities, such as blasting, which were "not only lawful but useful, usual and probably necessary" and were a reasonable use of property, thus requiring a showing of negligence for liability to be imposed upon the defendant. *Id.*

■ The above cases involved claims by purchasers against prior owners of the affected property. Rosenblatt urges that we apply the reasoning of these cases to hold Exxon strictly liable for the gasoline contamination of the land which he leased.

■ We are unwilling to extend the doctrine of strict liability to the claim presented in this case. We have taken care to limit the application of this doctrine because of the heavy burden it places upon a user of land. Our cases have limited the class of abnormally dangerous activities to those activities which would be abnormally dangerous in relation to the area where they occur.[6] Moreover, we have limited the

---

6. As we said in *Kelley, supra*, "[i]f a gasoline station owner has faulty tanks which leak gasoline into the underground water supply, that *might* be abnormally dangerous if the land ... is located in a well populated area." 304 Md. at 133, 497 A.2d 1143 (emphasis added). In

doctrine with regard to the class of actors to which it applies: we have required that the one engaging in the relevant activity have ownership or control over the land. *See Toy, supra,* 176 Md. at 213–14, 4 A.2d 757. And, finally, we have required that the act have a relation to the occupation or ownership of land. *See Kelley, supra,* 304 Md. at 133, 497 A.2d 1143.

By these limitations we have delineated narrow circumstances in which the imposition of an additional burden on the occupier of land is justified. When an owner or occupier of land engages in activities which are related to such ownership and occupation and which are abnormally dangerous in relation to the particular site, we place upon the actor the burden of bearing the risk of any harm to neighbors which arises from the activity, notwithstanding the absence of fault on the part of the actor. This burden is justified when weighing the rights of the actor, who benefits from the activity, against those of the occupants of neighboring land, who do not benefit and have no way of avoiding the harm to their property that may result from a dangerous activity on adjacent land. Subsequent users, however, are able to avoid the harm completely by inspecting the property prior to purchasing or leasing it. Thus, it is not unreasonable to

*Yommer,* we found the leakage of gasoline to be abnormally dangerous when the tank from which it leaked was located adjacent to a residential water supply. 255 Md. at 227, 257 A.2d 138. Gasoline leakage may not, however, be considered abnormally dangerous on another site, such as a commercial site which is not bordered by residential property. Similarly, while the New Jersey court in *T & E Industries, supra,* broadened the application of its doctrine to include claims by subsequent users of the land, its language reflected an intent to limit the scope of abnormally dangerous activities. It said, "The rule reflects a policy determination that such enterprises should bear the costs of accidents attributable to *highly dangerous or unusual* activities. Because some conditions and activities can be *so hazardous* and of such relative *infrequent occurrence,* the risk of loss is justifiably allocated as a cost of business to the enterpriser who engages in such conduct." 587 A.2d at 1257 (emphasis added).

expect subsequent users to bear the risk of such harm.[7] We think, however, that it would be unreasonable to hold the prior user liable to remote purchasers or lessees of commercial property who fail to inspect adequately before taking possession of the property.

■ Additionally, the extension of this doctrine is inconsistent with the principles set forth in the Restatement, upon which Maryland's strict liability principles are based. Section 519 of the Restatement makes clear that the harm for which the actor conducting the abnormally dangerous activity will be held liable is harm to the person or property *of another.* It would be illogical to interpret this language to hold the actor strictly liable for harm to the actor's own property in those cases in which, at some time thereafter, the property changes hands. Other courts have similarly held. *See Wellesley Hills Realty Trust v. Mobil Oil Corp.,* 747 F.Supp. 93 (D.Mass.1990) (Plaintiff failed to state a claim for strict liability for gasoline contamination of property by a prior owner because harm was not to property of another as required by the doctrine); *Futura Realty v. Lone Star Bldg. Centers,* 578 So.2d 363 (Fla.App. 3 Dist.1991) (same; rejecting the analysis of *T & E Industries*).

■ We note also that Rosenblatt alleges no personal injury or property damage resulting from the contamination; his only claimed losses are economic in nature. The doctrine of strict liability, by its express language and traditional application, is aimed at protecting against harm *to person or property* which arises from the dangerous activity. It is not designed to protect against economic losses resulting from failed business opportunities. Therefore, we will not extend the doctrine's application to a claim for economic loss by a

---

7. Moreover, the common law rule of caveat emptor, although legislatively abrogated in the context of residential property, is still applicable in Maryland with regard to the sale of commercial property. *See Council of Co-Owners v. Whiting-Turner,* 308 Md. 18, 517 A.2d 336 (1986). The doctrine of caveat emptor has traditionally been applied to lessees, as well. *See Prosser and Keaton, supra,* § 63 at 434–35.

lessee of commercial property against a prior lessee for gasoline contamination to the property leased.

## B

### The Negligence Claim

█ In order to state a cause of action in negligence, the plaintiff must show the following: (1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty. *See, e.g., Faya v. Almaraz,* 329 Md. 435, 448, 620 A.2d 327 (1993); *Lamb v. Hopkins,* 303 Md. 236, 241, 492 A.2d 1297 (1985). This duty of care owed to another requires an actor to conform to a certain standard of conduct so as to protect the other from unreasonable risk of harm. *Lamb, supra,* 303 Md. at 241, 492 A.2d 1297.

█ The existence of a legally cognizable duty owed by the defendant to the plaintiff or a class of persons of which the plaintiff is a member is essential to a cause of action for negligence. *Erie Ins. Co. v. Chops,* 322 Md. 79, 84, 585 A.2d 232 (1991). Thus, even if Rosenblatt can show that Exxon caused the property now leased by him to be contaminated and that he has suffered an injury resulting from the contamination, he cannot state a cause of action in negligence unless he first shows that Exxon owed a duty to him to avoid that injury. The question whether Exxon owed a duty to Rosenblatt is an issue of law, to be determined by the court. *See* Prosser and Keeton, *Law of Torts,* § 45 at 320 (5th ed. 1984).

█ It is well settled that an occupier of land owes certain duties with regard to the safety of individuals who come onto the land, the extent of the duty being dependent upon the status of the visitor, i.e. as an invitee or licensee. *See, e.g., Wagner v. Doehring,* 315 Md. 97, 101–02, 553 A.2d 684 (1989); *Henley v. Prince George's County,* 305 Md. 320, 339, 503 A.2d 1333 (1986). Similarly, the occupier of land owes a duty to

occupants of neighboring land to use care when conducting activities on the land so as to avoid causing harm to the neighboring land. *See Toy, supra,* 176 Md. at 208–09, 4 A.2d 757. We have not heretofore extended the duty of the occupier of land to the avoidance of harm to one's *own* land that may cause injury or loss to a subsequent occupier of the same land.

In determining the existence of a duty owed to a plaintiff, we have applied a "foreseeability of harm" test, which is based upon the recognition that duty must be limited to avoid liability for unreasonably remote consequences. *Henley, supra,* 305 Md. at 333, 503 A.2d 1333. Inherent also in the concept of duty is the concept of a relationship between the parties out of which the duty arises. *See Prosser and Keeton, supra,* § 53 at 356. But, ultimately, the determination of whether a duty should be imposed is made by weighing the various policy considerations and reaching a conclusion that the plaintiff's interests are, or are not, entitled to legal protection against the conduct of the defendant. *Id.* at 357–58.

In this situation, we conclude that they are not. There exists no relationship between the parties which would have made it foreseeable that an act or failure to act by Exxon would result in harm to Rosenblatt. Moreover, we are unwilling to impose upon a lessee of commercial property a duty to remote successor lessees for losses resulting from a condition on the property that could have been discovered with reasonable diligence prior to occupancy and thus could have been avoided.

The imposition of a duty upon one to another serves to balance the burdens between the parties in avoiding the harm. As earlier discussed, we have recognized that care must be taken to avoid unduly burdening an occupant of land in the use of the land. But we have imposed a duty upon the occupant of land where it would be unreasonable to expect the other party to be able to protect itself from the harm, as in the case of occupiers of adjacent land or guests who come onto the land. A lessee of commercial property, however, is expected to make basic inquiry and inspection of the property prior to

entering into a lease. When Rosenblatt entered into the lease, he was aware that the property had been used for a gas station. Thus, he knew or should have known that gasoline contamination was possible. He could have required that the property be tested for contamination; he could have negotiated express warranties in the lease. He was in a position to avoid completely the harm he now alleges.

Because there was no duty owed to Rosenblatt, we conclude that Exxon was entitled to judgment on the negligence count as a matter of law; hence, summary judgment was correctly entered.

### The Trespass Claim

When a defendant interferes with a plaintiff's interest in the exclusive possession of the land by entering or causing something to enter the land, a trespass occurs. *See Rockland, Inc. v. H.J. Williams,* 242 Md. 375, 385, 219 A.2d 48 (1966).

We have recognized that a trespass occurs when there is interference in the exclusive possession of the land of another, *see Rockland, supra,* but we have never recognized a trespass where the thing which intrudes actually entered the land during the "trespasser's" possession and the plaintiff took possession of the land subsequent to the "intrusion."

Rosenblatt relies upon § 161 of the Restatement (Second) of Torts (1965) to support his position that Exxon committed a trespass when it allegedly caused the property to be contaminated during its occupancy and the contamination continued into Rosenblatt's occupancy of the land. Section 161 provides that: "A trespass may be committed by the continued presence on the land of a structure, chattel, or other thing which the actor has tortiously placed there."

Section 161 does not support Rosenblatt's position. It explicitly provides that a trespass involves the *tortious placing* of something on the land and implicitly provides that the affected land is the land *of another.* Section 158 further supports this interpretation. It states that "one is subject to liability to another for trespass ... if he intentionally enters

land *in the possession of the other,* or causes a thing or a third person to do so, or remains on the land, or fails to remove from the land a thing which he is under a duty to remove." (emphasis added). Exxon did not cause the contamination to occur during Rosenblatt's occupancy; the introduction of the contamination could only have occurred prior to its relinquishing possession of the land. Additionally, Exxon owed Rosenblatt no duty to remove the contamination.

Rosenblatt cites no authority, nor do we find any, to support the position he asserts. At least two courts have explicitly rejected similar claims, *see Wilson Auto Enterprises v. Mobil Oil Corp.,* 778 F.Supp. 101 (D.R.I.1991) (company's release of oil on own land could not constitute trespass upon subsequent occupier); *Wellesley Hills, supra,* 747 F.Supp. at 99 (same), and we think that theirs is the better interpretation. We conclude, therefore, that the trial court did not err in granting Exxon's motion for summary judgment.

### The Nuisance Claim

Rosenblatt cites no legal authority for his claim that the law provides a cause of action in nuisance to a subsequent occupant of land against a prior occupant for activities conducted on the land during the prior occupancy. Nor does our review of the authorities reveal any support for this position.

We have considered the application of the theory of nuisance with regard to the rights of the community at large, in a situation involving a public nuisance, *see Tadjer v. Montgomery County,* 300 Md. 539, 479 A.2d 1321 (1984), and the rights of adjoining property owners, in the context of a private nuisance, *see WSSC v. CAE–Link Corp.,* 330 Md. 115, 622 A.2d 745, *cert. denied,* —— U.S. ——, 114 S.Ct. 288, 126 L.Ed.2d 238 (1993).[8]

---

8. A public nuisance is a criminal offense involving an interference with the community at large, as in the case of the obstruction of a highway. A private nuisance, as is claimed here, is a civil matter, involving the disturbance of an individual's rights in land. *Prosser and Keeton, supra,* § 87 at 618.

Section 821D of the Restatement (Second) of Torts (1965) defines a private nuisance as "a nontrespassory invasion of another's interest in the private use and enjoyment of land." In this regard, we have held that "where a trade or business as carried on interferes with the reasonable and comfortable enjoyment by another of his property, a wrong is done to a *neighboring* owner for which an action lies...." *Meadowbrook Swimming Club v. Albert,* 173 Md. 641, 645, 197 A. 146 (1938) (emphasis added).

We have not previously considered a nuisance claim by a subsequent occupier of property. Courts which have considered such claims have rejected them on the basis that a cause of action for private nuisance requires an interference with a *neighbor's* use and enjoyment of the land. *See Philadelphia Electric Co. v. Hercules, Inc.,* 762 F.2d 303, 313–15 (3d Cir.), *cert. denied,* 474 U.S. 980, 106 S.Ct. 384, 88 L.Ed.2d 337 (1985); *Mayor and Council v. Klockner & Klockner,* 811 F.Supp. 1039, 1057–58 (D.N.J.1993); *Berry v. Armstrong Rubber Co.,* 780 F.Supp. 1097, 1103 (S.D.Miss.1991), *aff'd,* 989 F.2d 822 (5th Cir.1993); *Wilson Auto, supra,* 778 F.Supp. at 106; *Hanlin, supra,* 759 F.Supp. at 935; *Wellesley Hills, supra,* 747 F.Supp. at 98–99. We are in agreement with these authorities. We conclude, therefore, that the instant case does not present a cause of action for nuisance, and the trial court was correct in granting summary judgment on this count.

*JUDGMENT AFFIRMED, WITH COSTS.*