**DELLINGER et al. v. SKELLY OIL CO. et al.**

**No. 2834.**

Court of Civil Appeals of Texas. Eastland.
Feb. 9, 1951.

Rehearing Denied March 2, 1951.

Beall · & Yonge, and James Pearson, Sweetwater, for appellants. ·

James Little, Big Spring, for appellees.

COLLINGS, Justice.

This suit was filed by appellants, Mrs. B. V. Dellinger and husband, B. V. Dellinger, against Skelly Oil Company and The Independent Exploration Company. Appellants alleged that The Independent Exploration Company, acting as the agent of Skelly Oil Company, while conducting seismic operations on land adjoining a tract owned by appellants, negligently set off charges of dynamite in test holes which proximately caused their water well to dry up to their damage. The specific acts of negligence charged by appellants against appellees were: (1) that they conducted exploratory operations too close to appellants' well; (2) that they used excessive charges of dynamite in conducting their operations, and (3) that they exploded such charges at the same depth as the water well when they knew or should have known that such explosions at such depth would ruin the well. Appellants presented their case and rested and appellees rested without offering evidence. The court, upon motions by appellees, withdrew the cause from the jury and rendered judgment for appellees.

The evidence discloses that appellants owned a half section of land near Mary-

neal in Nolan County, Texas, with a 75 foot water well near the west end of such tract; that the well had been in use about 13 years prior to October, 1948, and would produce from 4 to 5 gallons of water per minute. It had been supplying water for about 300 head of sheep prior to the time it began to dry up. The shallow water in that community runs in streams and is usually found at a depth of 60 to 80 feet below the surface.

On September 1, 1948, appellee, The Independant Exploration Company, in the employ of Skelly Oil Company, sent a seismograph party to the Maryneal community for the purpose of conducting exploratory operations to determine whether the formations in that community were favorable for the accumlation of oil and gas. On September 9th they were conducting such operations on a tract of land which corners with the land owned by appellants upon which the water well in question is located. Two test holes had been drilled to a depth of approximately 70 feet where they encountered crevices and lost all of their mud. Another hole was then drilled to a depth of 75 feet in which the Exploration Company, on such date inserted two 25 pound charges of dynamite at different times. The evidence shows that in conducting its operations in the Maryneal community, the Exploration Company used explosives in the amount of 25 pounds, or less.

The distance from appellants' well to the place where the shooting occurred was 894 feet. There was nothing to obstruct a person's view between the place of the shooting and the water well. An examination of a picture introduced in evidence shows very little difference in the surface elevation of the water well and the test holes. The wind mill at appellants' well was only a four foot mill and the tower and other equipment on the well indicated that it was a shallow well.

A Mr. Jones, who was appellants' neighbor and was pasturing approximately 100 herd of sheep on appellants' land, went to see about his stock on October 1st and found that the well was no longer pumping water. He contacted Mr. Dellinger about the matter and the two of them examined the well. They pulled the sucker rod, put on new leathers and re-assembled the wind mill, but it still did not produce water. They then went back into the well again but were again unsuccessful. The evidence shows that within 3 or 4 days appellants expected to move the stock which had been using this well to another pasture. When the well ceased to supply water, they moved the stock prior to the time intended.

In March, 1949, appellant Dellinger again wanted to use the pasture and again attempted to fix the well. He employed a water well repairman and they put new leathers on the sucker rods but the well still produced no water and when a careful examination was made it was found that the bottom of the well was entirely dry. Appellants then hired a driller to drill another well during the first part of June of 1949. In this new well no water was found at the 75 foot depth and to get water, it was necessary to drill to a depth of 230 feet. The increased depth of the new well required considerable extra expense not only in the cost of drilling but also for special sucker rods, additional casing and a larger tower and mill.

There was testimony to the effect that a water well which dries up from natural causes in the Maryneal community will get weaker and weaker over a period of about a year and finally quit producing water. The evidence shows that the well here involved was pumping water within a week before it was discovered by Mr. Jones to be no longer producing.

Appellees discharged their two 25 pound shots of dynamite on the 9th of September, 1948, and the testimony indicated that the well would not pump water on October 1, 1948. The shots were detonated in a hole approximately 75 feet deep and appellants' water well was 75 feet deep. There was no testimony as to whether the Exploration Company found any water in the test hole in which the shots were discharged.

Walter Stapp testified that he had experience in blasting with dynamite at distances between 800 and 900 feet from water wells; that he had drilled wells which originally produced less water than

desired and would then drill another well about 300 yards from the first and strike the same stream of water, then shoot the second well. He testified that this course of procedure would sometimes result in one or two good wells or that it might ruin both of the wells. He stated that he had known blasting within 300 or 400 yards of a water well to dry it up; that he had made a study of the effect of blasting on water wells and the nature and characteristics of underground water and its habits. He testified that the thickness of the sands and formations in which the water was located made a great deal of difference in the amount of dynamite that could be safely used and that a proper study of the sands concerned could reasonably determine what amount of dynamite could be used without damaging nearby wells. He stated that if the shooting was carried on above or below the water sand it would not ordinarily ruin other water wells but that this depended upon the size of the shots used, and that if the shots were made 100 feet from the water sand it would take an "awful shot" to damage a nearby well. He testified that a 25 pound shot was a large shot.

■ It is well settled in this State that liability for damage caused by the use of explosives hinges upon the existence of negligence in setting off the explosion. Turner v. Big Lake Oil Co., 128 Tex. 155, 96 S.W.2d 221; Indian Territory Illuminating Oil Co. v. Rainwater, Tex.Civ.App., 140 S.W.2d 491 (Err.Dis.); Crain v. West Texas Utilities Co., 218 S.W.2d 512 (N.R. E.); Standard Paving Co. v. McClinton, Tex.Civ.App., 146 S.W.2d 466; Stanolind Oil & Gas Co. v. Lambert, Tex.Civ.App., 222 S.W.2d 125; 35 C.J.S., Explosives, § 8, page 239.

The sole point presented on this appeal is appellants' contention that the trial court erred in withdrawing the case from the jury and entering judgment for appellees. Appellants urge that the pleadings and evidence presented controverted issues of fact which should have been submitted to the jury.

Appellees contend that the trial court properly withdrew the case from the jury and entered judgment for them because there was no evidence in the record, or in the alternative, that the evidence was insufficient to show (1) negligence on the part of appellees, or (2) that there was any causal connection between the operations conducted by appellee, The Independent Exploration Company, and appellants' well drying up.

■ In such cases, a satisfactory solution of the question of negligence is often difficult and this is particularly true when the injury complained of is produced by vibration and concussion. As a general rule, one is held to be negligent when he commits an act which he could have or ought to have foreseen or known would result in damages or injury to another. Houston & T. C. R. Co. v. Walsh, Tex.Civ. App., 183 S.W. 18; Fort Worth Gas Co. v. Cooper, Tex.Civ.App., 241 S.W. 282.

In the case of Comanche Duke Oil Co. v. Texas Pacific Coal & Oil Co., Tex.Com. App., 298 S.W. 554, 561, it is stated that negligence in such cases "may consist in doing something which ought either to be done in a different manner or not at all." Although the last cited case recognizes the right to use explosives on land by its owner or under his authority, the manner of that use is required to be "duly careful" to avoid injury to the property or persons of others. Due care, of course, varies with the facts and circumstances of the case and is determined in each instance by the nature and extent of the explosion, its location and proximity to the property and persons of others, and various other facts and conditions which might reasonably bear upon the question in a given case.

The evidence shows that appellants' well was 894 feet from the test hole in which appellees set off the two charges of dynamite. The surface depth at which the charges were detonated was the same as the surface depth of the water well. A picture in evidence indicates little, if any, difference in the surface elevation of the well and the test hole. The 4 foot mill and the short wind mill tower which covered the well indicated that it was shallow. The well was in plain view from the test hole. These facts put appellees on notice of the

678

existence of appellants' water well and of the fact that it was a shallow well and all other facts which proper inquiry would have disclosed. They had the duty to use due care not to injure or destroy the well. They had the duty not to set off a charge of dynamite of such size or in such manner or location as could reasonably have been foreseen under the circumstances to injure or destroy the well. No certainty of the injury foreseen by appellees is required. They had no right to set off a charge which they could reasonably foresee might injure the well. To set off such a charge when they could foresee the reasonable possibility of injury to the well, even though such injury might be uncertain, would be a negligent disregard for the safety of the well.

██ There is general knowledge that explosives are dangerous but the amount of explosives that can be safely used under given circumstances and the manner of the use required for safety are not matters of general knowledge. We do not judicially know the details of blasting operations whether in connection with seismograph work or otherwise. A blast may be of such proportions and consequences as to be of itself evidence of negligence. Kelly v. McKay, Tex.Sup., 233 S.W.2d 121; 35 C.J.S., Explosives, § 11, p. 255. We do not have such an explosion in this case. In order to prove negligence in such cases it is ordinarily necessary to show a standard of safety and a departure therefrom. Stanolind Oil & Gas Co. v. Lambert, supra, and Comanche Duke Oil Co. v. Texas Pacific Coal & Oil Co., supra; Universal Atlas Cement Co. v. Oswald, 138 Tex. 159, 157 S.W.2d 636.

One of the grounds of negligence alleged by appellants was that appellees exploded the shot at the same depth as their well when they knew or should have known that an explosion of the kind used at that depth and location would ruin the well. Since appellees knew, or were charged with knowledge of the existence of the water well, its depth and formations, and its distance from the test hole, the remaining and important question is, did appellees, in view of all these facts and circumstances, exercise due care for the safety of appellants' well when they set off the two 25 pound shots of explosives at the depth of 75 feet below the surface. The following is the substance of the evidence bearing upon this question, which we must consider in its most favorable light to appellants' position.

The witness Walter Stapp testified that he had experience in blasting with dynamite within 800 to 900 feet of water wells; that a proper study of the sands and formations concerned would enable one to determine what amount of dynamite could be safely used in such blasting operations; that the thickness of such sands and formations made a great deal of difference in determining this question; that he had known of blasting within 300 to 400 yards of a water well to dry it up; that in such blasting operations he had used from 7 pounds (1 gallon) to as high as 60 pounds of dynamite; that if the shooting was carried on above or below the water sand it would not ruin other wells, depending, of course, on the size of the shots used; that if the shot was made around 100 feet of the water sand it would take an awful shot to damage a nearby well.

In addition to the above, Stapp testified as follows, bearing upon this question:

"Q. How much dynamite do you think a man—in your opinion—do you think a person could use—in a well 75 feet deep—approximately 900 feet from another well—without drying up the sand in the other well?

"Appellees' Counsel: We object to that as invading the province of the jury—they still haven't established the qualifications of the witness—I don't believe—and I object to it for that further reason.

"Appellants' Counsel: Its our view—we believe there's an excessive charge—we're not trying to have this man say that the charge was excessive—that would invade the province of the jury—we merely ask him what would be safe to use—

"Court: I'll permit the witness to say what effect it had—if any—You keep talking about drying up a well—

"Appellees' Counsel: What effect would it have—

"A. Its owing to the size of the shot—if a small shot—4 or 5 or 6 or 10 sticks—it would not hurt unless an awfully thin formation—but if you use solidified dynamite—you'r liable to tear things up.

"Q. The kind of sand has something to do with it? A. Yes—you have the hard and the soft sand—lots of that sand is hard—its not penetrated easily—you don't find water in that—until you get below it—if you put a little shot in that—it wouldn't come through—but if you put in a big shot—its liable to tear things up.

"Q. Do you consider a 25 pound shot of dyamite—a large or small shot? A. A large one."

 In our opinion, the above testimony may be fairly interpreted to indicate that the explosion of the two 25 pound shots were, under the circumstances, dangerous to and calculated to injure or destroy appellants' water well. It is undisputed that the shots were set off at a depth of 75 feet, the same as that of the water well, which was in plain view from the test hole and showed by the size of the mill and tower to be shallow. There was no evidence as to the kind of sand or formation in which appellees' shots were placed except that mud was lost in crevices at a depth of about 75 feet. Mr. Stapps testified, however, that even if the shots were made in hard sand which was "not penetrated easily" and in which a small shot could be safely used, that a 25 pound shot was "a large shot" which was liable to tear things up. This evidence did not specifically set a standard of safety and then demonstrate a violation of that standard, but simply presented the opinion of the witness who claimed to be experienced in water wells and in blasting in and near such wells that the size of the shots used at the location and depth where used, were dangerous, even if they were in hard sand in which larger blasts could be safely used than in softer sands or formations. This evidence raised a fact question as to whether the 25 pound shots set off by appellees were of such size that their use under the circumstances was in violation of appellees' duty to exercise due care for the safety of appellants' water well. Such fact question should have been presented to the jury.

 The evidence also raised a fact issue on the question of proximate cause. Stapp, who claimed to be experienced in water wells in the community, stated that wells which dried up from natural causes gradually became weaker over a period of about a year until they finally ceased to produce any water at all. This well followed a different pattern. It had ceased to produce water about three weeks after appellees set off their shots and in about a week after it had been observed to be producing in a satisfactory and apparently normal manner.

For the reasons stated, the judgment of the trial court is reversed and remanded.