Lloyd W. JONES, Edwin Lee Murray, Willard D. Sessions, Murray Gobert Trucking and Excavation, Inc., and General Truck Parts, Inc., Plaintiffs,

v.

TEXACO, INC., f/k/a The Texas Company, Defendant.

Civil Action No. H–96cv0015.

United States District Court, S.D. Texas.

Nov. 13, 1996.

Dennis C. Reich, Reich & Binstock, Houston, Texas, for Plaintiffs.

Robert W. Jones and Greg W. Curry, Thompson & Knight, Dallas, Texas, Wendy S. Oatis, Washington, D.C., for Defendant.

## MEMORANDUM AND ORDER

CRONE, United States Magistrate Judge.

Pending before the court is Defendant Texaco, Inc.'s ("Texaco") motion for partial summary judgment (#11). Texaco seeks summary judgment on Plaintiffs Lloyd Jones ("Jones"), Edwin Lee Murray ("Murray"), Willard D. Sessions ("Sessions"), Murray Gobert Trucking and Excavation, Inc. ("Gobert"), and General Truck Parts, Inc.'s ("General Truck") claims of negligence, gross negligence, and strict liability, as well as their request for declaratory and injunctive relief, to the extent those requests are based on the common law. Plaintiff Murray voluntarily dismissed his action on October 18, 1996.

Having reviewed the motion, the submissions of the parties, the pleadings, and the applicable law, the court is of the opinion that Texaco's motion for partial summary judgment should be granted.

I. *Background*

In November 1904, J.H. and Annie Koinm transferred to Texaco a parcel of land located in Humble, Harris County, Texas, commonly known today as the Humble Office and Industrial Park. From 1904 until 1969, Texaco operated an oil field waste disposal site on the property. During the period of its ownership, Texaco deposited oil sludge and various wastes into earthen pits dug on the property.

In March 1969, Texaco transferred the property to Hubert Vestal ("Vestal"). A clause in the deed recording this transfer references these sludge pits. The deed from Texaco to Vestal, dated March 28, 1969, specifically states:

> there [are] located on said land multiple earthen pits containing oil sediment, water and various other wastes and substances, together with sundry excavations, junk and other objects.

The deed also provided that Vestal had inspected the property, was fully aware of the pits and residual oil, and accepted the land "as is." The deed confirms:

> Grantee further acknowledges that he has conducted an on the ground inspection of said land and the above enumerated conditions and is familiar therewith and hereby accepts the risk of any and all conditions thereon, whether known or unknown at the date of this instrument.

In April 1969, Vestal sold the property to S. Miles Strickland III and Doyle Bond. In March 1970, Strickland transferred his portion to Boyd. In December 1977, Bond conveyed the property to Duane Pettyjohn. In January 1978, Pettyjohn sold the property to Houston Lighting and Power ("HL & P"). In August 1983, HL & P transferred the property to Humble Mini–Storage, Inc. From May through December 1985, Humble Mini–Storage transferred the property as separate lots to the plaintiffs.

When the plaintiffs purchased the properties, a layer of topsoil, asphalt, and, in some cases, structures concealed the pits where the various materials were deposited. Eventually, however, the wastes began to seep out of the ground and became apparent on the surface. The plaintiffs engaged an environmental engineering firm to perform an investigation consistent with the National Contingency Plan ("NCP") on August 22, 1994. The plaintiffs incurred response costs in compliance with the NCP for removal and remedial action.

According to the plaintiffs, they did not know of the contamination damage until after the results of the environmental testing became available in Fall 1994. They further assert that they did not learn of the impact the contamination had on their property values until the completion of an appraisal on

September 14, 1995. At deposition, however, Plaintiff Jones admitted that he had observed oil contamination on his property in 1991 or 1992 when he brought fill in to cover residue on the ground. He also wrote a letter to R.W. Bambeck of General Truck, dated June 15, 1993, informing him that he would no longer pay rent for a portion of the property due to "area contamination." The record further reflects that in September 1993, General Truck protested its 1993 property tax evaluation by the Harris County Appraisal District on the basis that a lower assessed value of the land was warranted due to "contamination—(oil)." Moreover, at deposition, Bambeck, the president and owner of General Truck, admitted that he had received Jones's letter of June 15, 1993, in which Jones complained of "area contamination."

The plaintiffs initially filed suit in state court in Harris County, Texas, on December 6, 1995. In the petition, they alleged the following claims for relief:

1. Response costs pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq.;

2. Declaratory judgment stating that Texaco is liable to plaintiffs;

3. Mandatory injunction ordering Texaco to commence removal of wastes as remedial action to cure damage;

4. Preliminary injunction forcing Texaco to comply with any clean-up and remediation orders;

5. Common law negligence;

6. Gross negligence; and

7. Strict liability.

Texaco, however, had previously filed a voluntary Chapter 11 reorganization petition under the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York. See Jointly Administered Chapter 11 Case Nos. 87–B–20142, 87–B–20143, and 87–B–20144. On March 23, 1988, the bankruptcy court confirmed Texaco's Second Amended Joint Plan of Reorganization, discharging Texaco from any and all claims arising before the date of confirmation. On January 4, 1996, Texaco removed this case to the United States District Court for the Southern District of Texas based on the relation of the claims to the previous bankruptcy proceeding. See 28 U.S.C. §§ 157, 1334, 1452(a). Removal was also authorized under this court's federal question jurisdiction based on the plaintiffs' CERCLA claims. See 28 U.S.C. §§ 1331, 1441(c).

On May 8, 1996, Texaco moved for partial summary judgment on the plaintiffs' state common law claims of negligence, gross negligence, and strict liability. Texaco contends that these claims are barred by the statute of limitations. Texaco further asserts that a purchaser of real property cannot maintain a tort claim against a prior owner for alleged contamination of the property before the subsequent purchaser acquired his interest in the property.

## II. Analysis

### A. Summary Judgment Standard

Rule 56(c) provides that "[summary] judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); Williams v. Adams, 836 F.2d 958, 960 (5th Cir.1988). The moving party, however, need not negate the elements of the non-movant's case. Wallace v. Texas Tech Univ., 80 F.3d 1042, 1047 (5th Cir.1996); Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir.1994) (en banc).

Once a proper motion has been made, the non-moving party may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing the

existence of a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Anderson*, 477 U.S. at 257, 106 S.Ct. at 2514–15; *Wallace*, 80 F.3d at 1047; *Little*, 37 F.3d at 1075. The controverted evidence must be viewed in the light most favorable to the non-movant, and all reasonable doubts must be resolved against the moving party. *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49 n. 5, 111 S.Ct. 401, 402 n. 5, 112 L.Ed.2d 349 (1990); *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513–14; *Judwin Properties, Inc. v. United States Fire Ins. Co.*, 973 F.2d 432, 435 (5th Cir.1992). Nevertheless, neither " 'conclusory allegations' nor 'unsubstantiated assertions' will satisfy the non-movant's burden." *Wallace*, 80 F.3d at 1047 (quoting *Little*, 37 F.3d at 1075). Summary judgment is mandated if the non-movant fails to make a showing sufficient to establish the existence of an element essential to its case on which it bears the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. at 2552. "In such situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Id.* at 323, 106 S.Ct. at 2552.

### B. *Statute of Limitations*

#### 1. *The General Rule*

■■■ "The purpose of the statutes of limitations is to compel the assertion of claims within a reasonable period while the evidence is fresh in the minds of the parties and witnesses." *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex.1996); *see Murray v. San Jacinto Agency, Inc.*, 800 S.W.2d 826, 828 (Tex.1990). " 'Society's interest in repose is to have disputes either settled or barred within a reasonable time. It is based on the theory that the uncertainty and insecurity caused by unsettled claims hinder the flow of commerce.' " *Computer Assocs. Int'l, Inc.*, 918 S.W.2d at 455 (quoting *Safeway Stores, Inc. v. Certainteed Corp.*, 710 S.W.2d 544, 545 (Tex.1986)). Moreover, state legislatures want to protect "resident defendants of that state and that state's courts from the burdens of dealing with stale claims." *Industrial Indem. Co. v. Chapman & Cutler*, 22 F.3d 1346, 1351 (5th Cir.1994);

see also *Milestone Properties, Inc. v. Federated Metals Corp.*, 867 S.W.2d 113, 116 (Tex. App.—Austin 1993, no writ). The Texas Supreme Court has observed:

> Limitations statutes afford plaintiffs what the legislature deems a reasonable time to present their claims and protect defendants and the courts from having to deal with cases in which the search for truth may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents or otherwise. The purpose of a statute of limitations is to establish a point of repose and to terminate stale claims.

*Murray*, 800 S.W.2d at 828. Statutes of limitations are expressions of important legislative policies and should not be judicially abrogated without due consideration of those policies. *FDIC v. Dawson*, 4 F.3d 1303, 1311 (5th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 2673, 129 L.Ed.2d 809 (1994); *RTC v. Bright*, 872 F.Supp. 1551, 1562 (N.D.Tex. 1995).

■■■ The Texas statute upon which Texaco relies provides that a party must bring suit for damage to property no later than two years after the day the cause of action accrues. TEX.CIV.PRAC. & REM.CODE ANN. § 16.003(a). For purposes of application of a statute of limitations, a cause of action generally accrues when a wrongful act effects an injury, regardless of when the plaintiff learns of such injury. *Moreno v. Sterling Drug, Inc.*, 787 S.W.2d 348, 351 (Tex.1990); *Robinson v. C.W. Weaver*, 550 S.W.2d 18, 19 (Tex. 1977). "As a rule, ... a cause of action accrues when a wrongful act causes some legal injury, even if the fact of injury is not discovered until later, and even if all resulting damages have not yet occurred." *S.V. v. R.V.*, 933 S.W.2d 1, 4 (Tex.1996) (citing *Trinity River Auth. v. URS Consultants, Inc.*, 889 S.W.2d 259, 262 (Tex.1994); *Quinn v. Press*, 135 Tex. 60, 140 S.W.2d 438, 440 (1940)). Generally, a cause of action for injury to real property accrues when the injury is committed. *Lay v. Aetna Ins. Co.*, 599 S.W.2d 684, 686 (Tex.Civ.App.—Austin 1980, writ ref'd n.r.e.) (citing *City of Dallas v. Winans*, 262 S.W.2d 256, 258 (Tex.Civ.App.—

Dallas 1953, no writ); *Wichita County Water Improvement ·Dist. No. 1 v. Pearce,* 59 S.W.2d 183 (Tex.Civ.App.—Fort Worth 1933, no writ)). It is a personal right which belongs to the person who owns the property at the time of the· injury. *Lay,* 599 S.W.2d at 686 (citing *Bowie Sewerage Co. v. Vann,* 59 S.W.2d ·180 (Tex.Civ.App.—Fort Worth 1932), *modified,* 127 Tex. 97, 90 S.W.2d 561 (Tex.1936)). Without express provision, the right does not pass to a subsequent purchaser of the property. *Id.* (citing *Gulf C. & S.F. Ry. Co. v. Provo,* 84 S.W. 275 (Tex.Civ.App.—Austin 1904, no writ)). Thus, in this case, the injury to the land occurred prior to 1969, while Texaco still owned it. In *Lay,* the court held, "Any cause of action for damage to the property belonged to the owner at the time of injury.". *Id.*

 Texaco, however, asserts that because the waste pits were created during the time it owned the property,· the point where any injury would have occurred would have been when Texaco sold the property. Therefore, according to Texaco, any cause of action necessarily accrued in 1969. Yet, a cause of action does not accrue until facts come into existence which authorize the claimant to seek a judicial remedy. *Murray,* 800 S.W.2d at 828; *Robinson,* 550 S.W.2d at 19. "A right or. cause of action does not exist until facts exist which authorize the person asserting the claim to seek relief from the person or entity due to make reparation in a court of competent jurisdiction. It involves both the existence of the right and facts sufficient to constitute such a right of action." *Rogers v. Ricane Enters., Inc.,* 930 S.W.2d 157, 166 (Tex.App.—Amarillo 1996, n.w.h.). Hence, under this line of authority, assuming the plaintiffs had a cause of action for damage to . the land, they could have sought relief upon acquiring the property in 1985. Therefore, in the absence of an exception, limitations on the plaintiffs' claims expired, at the latest, in 1987. ·

## 2. *The Discovery Rule*

 The discovery rule represents an exception to the general rule of accrual of a cause of action for limitations purposes. The discovery rule is a judicially constructed test used to determine when a plaintiff's cause of action accrued. *Moreno,* 787 S.W.2d at 351; *see also Weaver v. Witt,* 561 S.W.2d 792, 794 (Tex.1977); *Clade v. Larsen,* 838 S.W.2d 277, 282 (Tex.App.—Dallas 1992, writ denied). "When applied, the rule operates to toll the running of the period of limitations until the time that the plaintiff discovers, or through the exercise of reasonable care and diligence should discover, the nature of his injury." *Moreno,* 787 S.W.2d at 351; *see Computer Assocs. Int'l, Inc.,* 918 S.W.2d at 455; *Trinity River Auth.,* 889 S.W.2d at 262. "The discovery rule tolls the statute only until the plaintiff has knowledge of facts which through reasonable diligence would lead to discovery of the injury, rather than discovery of the full extent of the damages." *Cornerstones Mun. Util. Dist. v. Monsanto Co.,* 889 S.W.2d 570, 576 (Tex.App.—Houston [14th Dist.] 1994, writ denied). In some instances, Texas courts have applied the discovery rule in actions seeking recovery for permanent damage to land. *See Bayouth v. Lion Oil Co.,* 671 S.W.2d 867, 868 (Tex.1984); *Hues v. Warren Petroleum Co.,* 814 S.W.2d 526, 529 (Tex.App.—Houston [14th Dist.] 1991, writ denied). Such an action has been said to accrue "upon discovery of the first actionable injury and not on the date when the extent of the damages to the land are fully ascertainable." *Bayouth,* 671 S.W.2d at 868; *Hues,* 814 S.W.2d at 529.

 The discovery rule exception applies, however, only in certain limited circumstances. *Computer Assocs. Int'l, Inc.,* 918 S.W.2d at 456. "The discovery rule, in application, proves to be a very limited exception to statutes of limitations." *Id.* at 455. Generally, the discovery rule is applied in cases where the nature of the injury is "inherently undiscoverable" and "objectively verifiable." *Id.* at 456; *see S.V.,* 933 S.W.2d at 5–7; *Johnson v. Abbey,* 737 S.W.2d 68, 69 (Tex. App.—Houston [14th Dist.] 1987, no writ). "Inherently undiscoverable" applies only to situations where " 'it is difficult for the injured party to learn of the negligent act or omission.' " *Computer Assocs. Int'l, Inc.,* 918 S.W.2d at 456 (quoting *Willis v. Maverick,* 760 S.W.2d 642, 645 (Tex.1988)). "Inherently undiscoverable encompasses the re-

quirement that the existence of the injury is not ordinarily discoverable, even though due diligence has been used." *Id.* As the Texas Supreme Court explained in *S.V.*:

> To be "inherently undiscoverable," an injury need not be absolutely impossible to discover, else suit would never be filed and the question whether to apply the discovery rule would never arise. Nor does "inherently undiscoverable" mean merely that a particular plaintiff did not discover his injury within the prescribed period of limitations; discovery of a particular injury is dependent not solely on the nature of the injury but on the circumstances in which it occurred and plaintiff's diligence as well. An injury is inherently undiscoverable if it is by nature unlikely to be discovered within the prescribed limitations period despite due diligence.

933 S.W.2d at 7. Hence, when permanent damage to land is not "inherently undiscoverable," the discovery rule does not apply. *Hues,* 814 S.W.2d at 529.

The plaintiffs contend that the discovery rule applies in this case because "a layer of topsoil concealed the hazardous wastes and hazardous substances on the property ... [h]ence a reasonable inspection could not, and did not disclose the hazardous substances." Texaco relies on the fact that the sludge pits were noted in the deed when it transferred the property to Vestal, and, therefore, the contamination was not "inherently undiscoverable." The plaintiffs contend that this theory of notice applies to ownership disputes and not to common law injury claims.

 As discussed above, the discovery rule is applied only where the plaintiff would have difficulty learning of the injury. When the information concerning the injury is contained in public records, especially records that the plaintiffs or their representatives would have reason to review, *i.e.,* deed records in the chain of title of the property they purchased, the injury cannot be regarded as "inherently undiscoverable." *See Rogers,* 930 S.W.2d at 169; *Koch Oil Co. v. Wilber,* 895 S.W.2d 854, 863 (Tex.App.—Beaumont 1995, writ denied); *Harrison v. Bass Enters. Production Co.,* 888 S.W.2d 532, 538 (Tex.

App.—Corpus Christi 1994, no writ). "A purchaser of land has constructive notice of all information contained in his grantor's chain of title, and he is bound by every recital, reference and reservation contained in or fairly disclosed by any instrument which forms an essential link in that chain." *NRC, Inc. v. Pickhardt,* 667 S.W.2d 292, 293 (Tex.App.—Texarkana 1984, writ ref'd n.r.e.). Similar to the facts in *Rogers,* here, the oil sludge pits were openly located on the property until at least 1969. The existence of the pits, as well as the presence of oil sediment and other wastes on the property, were also a matter of public record. Through the exercise of reasonable diligence, the plaintiffs should have learned of the waste pits and the resulting contamination of the land at or near the time they purchased the property in 1985. "In sum, this record simply does not demonstrate that the [actions] of which the [plaintiffs] complain were so inherently undiscoverable as to justify a discovery exception to the general repose rule represented by article 16.003(a)." *Rogers,* 930 S.W.2d at 169.

As the Texas Supreme Court recognized in *Robinson,* the preclusion of a legal remedy alone is not enough to justify a judicial exception to the legislative policy represented by a statute of limitation, and "the fact that a meritorious claim might thereby be rendered nonassertible is an unfortunate, occasional byproduct of the operation of limitations." 550 S.W.2d at 20. In *Computer Assocs. Int'l, Inc.,* the court explained:

> In the past, this Court has noted the 'shocking results' of barring a plaintiff's suit before the injury has even been discovered. This rationale offers no principled basis for distinguishing between cases in which the rule applies and those in which it does not. If carried to its logical conclusion, the rationale mandates applying the discovery rule exception to every case, thus eviscerating the whole notion of an absolute time bar to litigation. It is clear that 'preclusion of a legal remedy alone is not enough to justify a judicial exception to the statute. The primary purpose of limitations, to prevent litigation of stale or fraudulent claims, must be kept

in mind.' The discovery rule is a limited exception to strict compliance with the statute of limitations.

918 S.W.2d at 457 (citations omitted). The primary purpose of statutes of limitation is to prevent the litigation of stale claims—"to compel the assertion of claims within a reasonable period while the evidence is fresh in the minds of the parties and witnesses." *Computer Assocs. Int'l, Inc.*, 918 S.W.2d at 455; *see Robinson*, 550 S.W.2d at 20. Here, this goal can best be effectuated by finding the plaintiffs' action to be time-barred. Any witnesses with knowledge concerning the deposit of hazardous wastes in the pits between 1904 and 1969 would likely be dead, retired, or of unknown whereabouts. Even if located and alive, a witness's memory of events that occurred at a minimum twenty-seven years ago would be distorted by the passage of time and could not be considered "fresh." Relevant documents also would likely have been destroyed over the course of the last ninety-two years. Therefore, the events at issue in this case are not just stale, they are rancid. Under these circumstances, applying the discovery rule to preclude the running of limitations is not warranted.[1] *See Harrison*, 888 S.W.2d at 538.

Accordingly, because the existence of the pits and the presence of oil sediment and other wastes on the plaintiffs' property were not "inherently undiscoverable," the discovery rule is inapplicable to the facts of this case. Under § 16.003 of the Texas Civil Practice and Remedies Code, the plaintiffs' causes of action were time-barred, at the latest, in 1987. Therefore, Texaco is entitled to partial summary judgment as to the plaintiffs' common law claims of negligence, gross negligence, and strict liability on the basis of limitations.

### C. *Common Law Claims*

The plaintiffs' common law claims of negligence, gross negligence, and strict liability also fail on the merits.

### 1. *Negligence*

██ In Texas, for actionable negligence to arise, three elements must be satisfied: (1) a legal duty owed by one person to another; (2) a breach of that duty; and (3) damages proximately resulting from the breach. *Skipper v. United States*, 1 F.3d 349, 352 (5th Cir.1993), *cert. denied*, 510 U.S. 1178, 114 S.Ct. 1220, 127 L.Ed.2d 566 (1994); *Werner v. Colwell*, 909 S.W.2d 866, 869 (Tex.1995); *Doe v. Boys Club of Greater Dallas, Inc.*, 907 S.W.2d 472, 476 (Tex.1995); *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex.1990); *El Chico Corp. v. Poole*, 732 S.W.2d 306, 311 (Tex.1987); *Peerenboom v. HSP Foods, Inc.*, 910 S.W.2d 156, 161 (Tex. App.—Waco 1995, no writ).

██ The first inquiry addressed in all negligence cases is whether the defendant owed a duty to the plaintiff. *Crider v. United States*, 885 F.2d 294, 295 (5th Cir.1989), *cert. denied*, 495 U.S. 956, 110 S.Ct. 2561, 109 L.Ed.2d 743 (1990); *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex.1995); *Greater Houston Transp. Co.*, 801 S.W.2d at 525; *see also Richter v. Merchants Fast Motor Lines, Inc.*, 83 F.3d 96, 97 (5th Cir.1996); *Triplex Communications, Inc. v. Riley*, 900 S.W.2d 716, 720 (Tex.1995). The existence of a legally cognizable duty is a prerequisite to all tort liability. *Graff v. Beard*, 858 S.W.2d 918, 919 (Tex.1993). "In order to establish tort liability, a plaintiff must initially prove the existence and breach of a duty owed to him by the defendant." *Otis Engineering Corp. v. Clark*, 668 S.W.2d 307, 309 (Tex. 1983); *accord Greater Houston Transp. Co.*, 801 S.W.2d at 525; *El Chico Corp.*, 732 S.W.2d at 311. Whether a legal duty exists between a plaintiff and the defendant is a question of law for the court to decide from the facts and surrounding circumstances in question. *Smithkline Beecham Corp. v. Doe*, 903 S.W.2d 347, 351 (Tex.1995); *Centeq Realty Inc.*, 899 S.W.2d at 197; *Bird v. W.C.W.*, 868 S.W.2d 767, 769 (Tex.1994). As the Texas Supreme Court has explained, "In determining whether a legal duty exists we take

---

1. Even if the discovery rule applied, the plaintiffs' causes of action would be time-barred. The record reflects that Jones had actual notice of the contamination of the property by 1991 or 1992 and that General Truck was aware of the contamination by September 1993. The other plaintiffs had constructive notice of the contamination by virtue of the reference to the pits containing oil sediment and other wastes in the deed records.

into account not only the law and policies of this State, but the law of other states and the United States, and the views of respected and authoritative restatements and commentators." *Smithkline Beecham Corp.*, 903 S.W.2d at 351. When ascertaining whether the defendant owed a duty to the plaintiff, some of the factors the court considers include: "the risk, foreseeability, and likelihood of injury weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant." *Bird*, 868 S.W.2d at 769; *Graff*, 858 S.W.2d at 920; *Greater Houston Transp. Co.*, 801 S.W.2d at 525; *Mitchell v. Missouri–Kansas–Texas R.R. Co.*, 786 S.W.2d 659, 662 (Tex.), *cert. denied*, 498 U.S. 896, 111 S.Ct. 247, 112 L.Ed.2d 205 (1990).

■ The plaintiffs argue, in essence, that landowners owe a duty to subsequent transferees to refrain from using their own property in a way that might harm the property and cause injury or loss to future purchasers. Texas courts, however, have declined to impose such a duty on landowners with respect to direct purchasers of their property, much less with regard to remote, subsequent purchasers. *See Vann*, 90 S.W.2d at 563; *Lay*, 599 S.W.2d at 686; *City of Dallas v. Winans*, 262 S.W.2d at 258. Generally, in Texas, vendors of real property cannot be held liable, after they have conveyed the property, for injuries caused by dangerous conditions on the property. *See Roberts v. Friendswood Dev. Co.*, 886 S.W.2d 363, 367–68 (Tex.App.—Houston [1st Dist.] 1994, writ denied); *First Fin. Dev. Corp. v. Hughston*, 797 S.W.2d 286, 290–91 (Tex. App.—Corpus Christi 1990, writ denied); *Davis v. Esperado Min. Co.*, 750 S.W.2d 887, 888 (Tex.App.—Houston [14th Dist.] 1988, no writ); *Beall v. Lo–Vaca Gathering Co.*, 532 S.W.2d 362, 365 (Tex.Civ.App.—Corpus Christi 1975, writ ref'd n.r.e.). As the court explained in *United States v. Inmon*, a Federal Tort Claims Act case applying Texas tort law:

Generally, the liability of a grantor of real property for the dangerous or defective condition of the premises ceases upon the transfer of possession and control, regard-
less of whether the person injured is the transferee, or some third person to whom a duty of care is owed. The rule is subject to the qualification that, if the grantor knows of a latent defect or danger on the premises, and misleads the transferee into believing the premises are safe, or fails to disclose the defect when he has reason to believe that it will not be discovered by him, he may nevertheless be liable for any injury resulting therefrom.

205 F.2d 681, 684 (5th Cir.1953) (citations omitted). "This exception does not apply, however, when the vendee discovers or should have discovered the dangerous condition and has a reasonable opportunity to take precautions, or when the vendee has actual notice of the condition." *Roberts*, 886 S.W.2d at 368; *First Fin. Dev. Corp*, 797 S.W.2d at 219–92.

The courts of Texas have adopted the approach of the RESTATEMENT (SECOND) OF TORTS, §§ 351–353, regarding the liability of vendors for dangerous conditions existing on land at the time of transfer. *Graham v. United States*, 441 F.Supp. 741, 744 (N.D.Tex.1977); *Luna v. H & A Invs.*, 900 S.W.2d 735, 738 (Tex.App.—Corpus Christi 1994, no writ); *see Inmon*, 205 F.2d at 684; *Beall*, 532 S.W.2d at 364–65. The RESTATEMENT provides:

§ 351. Dangerous Condition After Vendor Transfers Possession

A vendor of land is not subject to liability for physical harm caused to his vendee or others while upon the land by any dangerous condition, whether natural or artificial, which comes into existence after the vendee has taken possession.

§ 352. Dangerous Conditions Existing at Time Vendor Transfers Possession

Except as stated in § 353, a vendor of land is not subject to liability for physical harm caused to his vendee or others while upon the land after the vendee has taken possession by any dangerous condition, whether natural or artificial, which existed at the time that the vendee took possession.

**1046**

§ 353. Undisclosed Dangerous Conditions Known to Vendor

(1) A vendor of land who conceals or fails to disclose to his vendee any condition, whether natural or artificial, which involves unreasonable risk to persons on the land, is subject to liability to the vendee and others upon the land with the consent of the vendee or his subvendee for physical harm caused by the condition after the vendee has taken possession, if

(a) the vendee does not know or have reason to know of the condition of the risk involved, and

(b) the vendor knows or has reason to know of the condition, and realizes or should realize the risk involved, and has reason to believe that the vendee will not discover the condition or realize the risk.

(2) If the vendor actively conceals the condition, the liability stated in Subsection (1) continues until the vendee discovers it and has reasonable opportunity to take effective precautions against it. Otherwise the liability continues only until the vendee has had reasonable opportunity to discover the condition and to take such precautions.

RESTATEMENT (SECOND) OF TORTS, §§ 351–353 (1977). As explained in PROSSER AND KEETON ON TORTS:

The vendor of real property who parts with title, possession and control of it ceases to be either an owner or occupier. Ordinarily, therefore, he is permitted to step out of the picture and shift all responsibility for the condition of the land to the purchaser.... Thus, in the absence of express agreement or misrepresentation, the purchaser is expected to make his own examination and draw his own conclusions as to the condition of the land; and the vendor is, in general, not liable for any harm resulting to [the vendee] or others from any defects existing at the time of transfer.

W. PAGE KEETON, ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 64 at 446–47 (5th ed. 1984).

The controlling law in Texas, as well as the applicable provisions of the RESTATEMENT, are rooted in the common law doctrine of caveat emptor. It is the legacy of the common law that in contracts for the sale of land, the doctrine of caveat emptor has been applied. Graham, 441 F.Supp. at 743. Two exceptions to the caveat emptor doctrine have evolved. Id. The first concerns undisclosed dangerous conditions known to the vendor. Id. The second concerns implied warranties imposed in some jurisdictions on a builder-vendor for a newly constructed home. Id.; see Humber v. Morton, 426 S.W.2d 554, 561–62 (Tex.1968). Otherwise, the heritage of the caveat emptor doctrine has for the most part retained it influence and application in real estate transactions. Graham, 441 F.Supp. at 744; see Turner v. Conrad, 618 S.W.2d 850, 853 (Tex.Civ.App.— Fort Worth 1981, writ ref'd n.r.e.). Historically, the deed of conveyance in a real estate transaction has been representative of the complete agreement between the vendor and vendee, to the exclusion of additional terms or liabilities. Graham, 441 F.Supp. at 744. The doctrine of caveat emptor is fundamentally based on the premise that the buyer and seller deal at arm's length and that the purchaser has means and opportunity to gain information concerning the subject matter of the sale which are equal to those of the seller. Humber, 426 S.W.2d at 557. The Reporter's Note to RESTATEMENT (SECOND) OF TORTS § 352 sums up the prevailing view regarding the liability of a vendor of land and the continuing viability of the doctrine of caveat emptor:

Under the ancient doctrine of caveat emptor, the original rule was that, in the absence of express agreement, the vendor of land was not liable to his vendee, or a fortiori to any other person, for the condition of the land existing at the time of transfer. As to sales of land this rule has retained much of its original force, and the implied warranties which have grown up around the sale of chattels never have developed. This is perhaps because great importance always has been attached to the deed of conveyance, which is taken to represent the full agreement of the parties, and to exclude all other terms and liabilities. The vendee is required to make his own inspection of the premises, and the

vendor is not responsible to him for their defective condition, existing at the time of transfer. Still less is he liable to any third person who may come upon the land.

■ Thus, in this case, under applicable Texas precedent, the RESTATEMENT, and the doctrine of *caveat emptor*, Texaco owed no duty to Vestal, the original purchaser of the property, for dangerous conditions on the land. This is not a situation where Texaco concealed or failed to disclose the condition of the property. Rather, it fully disclosed the existence of the pits as well as the presence of oil sediment and other wastes on the property in the deed, and Vestal inspected the property, accepting it "as is." At this juncture, to impose a duty upon Texaco to remote, subsequent purchasers, who acquired the land sixteen years after it had already passed through several other owners, is unwarranted. No relationship exists between Texaco and the plaintiffs that would justify the imposition of such a far-reaching duty. In any event, Texaco fulfilled any duty it may have had by disclosing the condition of the property in the deed. *See Davis,* 750 S.W.2d at 888. As noted above, the plaintiffs had constructive notice of this information, as it was contained in their chain of title. *NRC, Inc.,* 667 S.W.2d at 294. Under these circumstances, it would be unreasonable to impose upon Texaco a continuing duty, extending *ad infinitum,* to identify and personally apprise all future, potential purchasers of the property of its condition. To hold otherwise would contravene prevailing authority and destroy the doctrine of *caveat emptor* altogether.

In analogous situations, courts in other jurisdictions have declined to extend "the duty of the occupier of land to the avoidance of harm to one's *own* land that may cause injury or loss to a subsequent occupier of the same land." *Rosenblatt v. Exxon Co., U.S.A.,* 335 Md. 58, 642 A.2d 180, 189 (1994); *accord Hydro–Manufacturing, Inc. v. Kayser–Roth Corp.,* 640 A.2d 950, 955 (R.I.1994); *see also Weyerhaeuser Co. v. Edward Hines Lumber Co.,* No. 91 C 623, 1991 WL 169385, at *4 (N.D.Ill.1991). As the court noted In *Wellesley Hills Realty Trust v. Mobil Oil Corp.:*

This Court ... is aware of no legal authority which would support the imposition of a duty on an owner of land to maintain his or her property in a certain condition or to refrain from any activity affecting the property which would extend to future owners of the land. The imposition of such a duty would be unreasonable because such future owners may not be known or even contemplated at the time the landowner creates or maintains a condition on his or her property. Moreover, such a duty would unreasonably interfere with a landowner's right of ownership; the right to do with his or her property as desired without liability so long as he or she does not interfere with the interests of others.

747 F.Supp. 93, 100 (D.Mass.1990). Similarly, in *Wilson Auto Enters., Inc. v. Mobil Oil Corp.,* the court observed that the plaintiff, a subsequent purchaser, was, in essence, contending that the defendant, which had contaminated the plaintiff's property prior to transfer through the operation of a gas station, owed a duty to the world at large, including the plaintiff. 778 F.Supp. 101, 105 (D.R.I.1991). The court rejected this notion, pointing out, "[The plaintiff] consistently overlooks the fundamental principle of negligence law that liability requires a duty of care owed specifically to the plaintiff." *Id.* The plaintiffs in this case, likewise, overlook this fundamental concept of duty required under negligence law. In declining to find that prior owners of property owe remote purchasers a duty to maintain the property and to refrain from any activity that may harm the property, the court in *Hydro–Manufacturing, Inc.* reasoned:

In reaching this conclusion, we note that the duty that sellers owe to subsequent purchasers is established primarily through contracts between the parties who theoretically reach an arms-length agreement on a sale price that reflects the true value of land. A buyer has the option to inspect the property and inquire into possible defects prior to purchase. A seller who does not answer truthfully is liable in an action for misrepresentation. A buyer concerned with the truthfulness

of the seller's answer or of possible future liability resulting from a prior owner's actions can seek a reduction in the sale price, seek indemnity from the seller (through a warranty), or walk away from the sale. A buyer, then, under an affirmative duty to inspect the land and make reasonable inquiry, can negotiate a selling price that reflects the land's actual, economic value. Under the doctrine of caveat emptor ... the liability of the seller can thus be limited by the terms expressed in the agreement between the parties. Buyers of contaminated land, unlike the victims of negligent acts, are in a position to protect themselves through contract or by refusing to conclude a transaction.

640 A.2d at 955–56 (citations omitted). "Where, as here, the rule of *caveat emptor* applies, allowing a vendee a cause of action ... for conditions existing on the land transferred—where there has been no fraudulent concealment—would in effect negate the market's allocations of resources and risks, and subject vendors who may have originally sold their land at appropriately discounted prices to unbargained—for liability to remote vendees." *Philadelphia Elec. Co. v. Hercules, Inc.*, 762 F.2d 303, 314–15 (3d Cir.), *cert. denied*, 474 U.S. 980, 106 S.Ct. 384, 88 L.Ed.2d 337 (1985).

Thus, this court, like other courts across the country, is unwilling to impose liability under a negligence theory upon a prior landowner in favor of remote, subsequent purchasers for losses resulting from a condition on the property they could have discovered with reasonable diligence prior to purchase and avoided. Because there was no cognizable duty owed to the plaintiffs by Texaco in this context, summary judgment is proper as to the plaintiffs' negligence claims.

### 2. *Gross Negligence*

In 1981, the Texas Supreme Court analyzed the history of the gross negligence theory in Texas and concluded that "all roads" lead to the following definition of gross negligence:

Gross negligence, to be the ground for exemplary damages, should be that entire want of care which would raise the belief that the act or omission complained of was the result of a conscious indifference to the right or welfare of the person or persons to be affected by it.

*Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 920 (Tex.1981). This definition is taken verbatim from *Missouri Pac. Ry. Co. v. Shuford*, 72 Tex. 165, 10 S.W. 408, 411 (1888) and is little changed from when the Texas Supreme Court first defined gross negligence in *Southern Cotton Press*, 52 Tex. 587 (1880). *See Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 19 (Tex.1994). In 1987, however, the legislature modified the common law definition:

"Gross negligence" means more than momentary thoughtlessness, inadvertence or error of judgment. It means such an entire want of care as to establish that the act or omission was the result of actual conscious indifference to the rights, safety, or welfare of the person affected.

TEX.CIV.PRAC. & REM.CODE ANN. § 41.001(5) (Vernon Supp.1994). The statutory definition of gross negligence, when compared with the common law definition, emphasizes that the evidence must establish the defendant's actual conscious indifference, rather than raise the mere belief that conscious indifference might be attributable to a hypothetical reasonable defendant. *Moriel*, 879 S.W.2d at 20. In *Moriel*, the court determined that because the Tort Reform Act of 1987 codified the common law definition and made no change affecting the basic elements of gross negligence, the language defining gross negligence to be applied in a particular case should not turn on the applicability of the Act. *Id.*

In addition, the Texas Supreme Court in *Moriel* set certain parameters for a finding of gross negligence, explaining that gross negligence involves two components: (1) the defendant's act or omission, and (2) the defendant's mental state. *Id.* As defined, the act or omission must involve behavior that endangers the rights, safety, or welfare of the person affected. *Id.* "Gross negligence, then, differs from ordinary negligence with respect to both elements—the defendant must be 'consciously indifferent' and his or her conduct must 'create an extreme degree

of risk.'" *Id.* (quoting *Williams v. Steves Indus. Inc.,* 699 S.W.2d 570, 573 (Tex.1985)); *see also Wal–Mart Stores, Inc. v. Alexander,* 868 S.W.2d 322, 326 (Tex.1993). The *Moriel* court elaborated:

> As we have recently reiterated, the test for gross negligence 'contains both an objective and a subjective component.' Subjectively, the defendant must have actual awareness of the extreme risk created by his or her conduct. Objectively, the defendant's conduct must involve an 'extreme degree of risk,' a threshold significantly higher than the objective 'reasonable person' test for negligence. Extreme risk is a function of both the magnitude and the probability of the anticipated injury to the plaintiff. As we said in *Wal–Mart,* the 'extreme risk' prong is not satisfied by a remote possibility of injury or even a high probability of minor harm, but rather 'the likelihood of serious injury' to the plaintiff.

*Moriel,* 879 S.W.2d at 21–22 (quoting *Wal–Mart Stores, Inc.,* 868 S.W.2d at 326–27). The court cautioned that determining whether an act or omission involves extreme risk or peril requires an examination of the events and circumstances from the viewpoint of the defendant at the time the events occurred, without viewing the matter in hindsight. *Id.* at 23. The *Moriel* court concluded:

> In summary, the definition of gross negligence includes two elements:
>
> (1) viewed objectively from the standpoint of the actor, the act or omission must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and (2) the actor must have actual, subjective awareness of the risk involved, but nevertheless proceed in conscious indifference to the rights, safety, or welfare of others.

*Id.*

In 1995, the Texas Civil Practice and Remedies Code was amended to delete "gross negligence" as a defined term. The *Moriel* factors, discussed above, however, are now incorporated in the definition of "malice" under the Code:

> (7) "Malice" means:

> (A) a specific intent by the defendant to cause substantial injury to the claimant; or
>
> (B) an act or omission:
>
> (i) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk considering the probability and magnitude of the potential harm to others; and
>
> (ii) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

TEX.CIV.PRAC. & REM.CODE ANN. § 41.001(5) (Vernon 1996). The amended Act took effect on September 1, 1995, and applies only to causes of action that accrued on or after that date. Therefore, in the case at bar, the prior statutory definition as well as the common law concept of gross negligence will be considered.

■ Here, the plaintiffs allege that Texaco's acts and omissions in operating the facility in a manner which allowed the release of hazardous substances and hazardous wastes demonstrates their reckless, wanton, and outrageous indifference to the hazardous consequences to the environment. To be actionable, however, gross negligence requires conscious indifference to the rights, safety, or welfare of a person or persons— the plaintiffs—not the environment. Here, the plaintiffs are unable to establish a claim for negligence, much less gross negligence. As discussed above, Texaco owed the plaintiffs no duty to forego depositing oil and other wastes on its own property between 1904 and 1969. If Texaco had no duty to the plaintiffs under a theory of simple negligence, Texaco, likewise, had no duty to the plaintiffs to refrain from engaging in gross negligence. Absent a duty, Texaco could not have infringed upon their rights as future, subsequent purchasers of the property under a theory of either simple or gross negligence. Moreover, even if a duty existed, the plaintiffs have not shown, and are unable to show, conscious indifference on the part of Texaco to their rights, safety, or welfare by virtue of the fact that Texaco was not even aware of their existence at the time

it engaged in the activities in dispute. Therefore, the plaintiffs' gross negligence claims are without merit.

### 3. *Strict Liability*

The plaintiffs allege that Texaco's use of its own property as a facility for the disposal of hazardous substances and wastes constitutes an abnormally dangerous activity which created and continues to create an unreasonable risk of injury to them.

The doctrine of strict liability for the operation of abnormally dangerous activities was first enunciated in the English case of *Rylands v. Fletcher*, L.R., 3 H.L. 330 (1868). The rule of law that emerged from the *Rylands* case is that "the person who for his own purpose brings on his lands and collects and keeps there anything likely to do mischief if it escapes must keep it at his peril, and if he does not do so, is prima facie answerable for all the damage which is the natural consequence of its escape." *Wellesley Hills Realty Trust*, 747 F.Supp. at 101. This theory of liability was later incorporated into the RESTATEMENT (SECOND) OF TORTS:

§ 519. General Principle

(1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land, or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.

(2) This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous.

§ 520. Abnormally Dangerous Activities

In determining whether an activity is abnormally dangerous, the following factors are to be considered:

(a) existence of a high degree of risk of some harm to the person, land or chattels of others;

(b) likelihood that the harm that results from it will be great;

(c) inability to eliminate the risk by the exercise of reasonable care;

(d) extent to which the activity is not a matter of common usage;

(e) inappropriateness of the activity to the place where it is carried on; and

(f) extent to which its value to the community is outweighed by its dangerous attributes.

RESTATEMENT (SECOND) OF TORTS, §§ 519–520.

■ Texas courts have repeatedly repudiated the general rule announced in *Rylands. Turner v. Big Lake Oil Co.*, 96 S.W.2d 221, 222, 226 (Tex.1936). As the Texas Supreme Court observed in *Turner*, "By making the liability absolute, the rule in *Fletcher v. Rylands*, taken literally, imposes an unqualified restriction upon the right of an owner of land to put it to a use lawful in itself." 96 S.W.2d at 223. Texas, likewise, has not adopted §§ 519 and 520 of the RESTATEMENT. In fact, Texas courts, when confronted with the opportunity to apply strict liability for ultrahazardous activities, have declined to do so and have consistently required some other showing, such as negligence or trespass, for recovery. *Robertson v. Grogan Inv. Co.*, 710 S.W.2d 678, 679–80 (Tex.Civ.App.—Dallas 1986, no writ); *see Turner*, 96 S.W.2d at 222, 226; *Day & Zimmermann, Inc. v. Strickland*, 483 S.W.2d 541, 548 (Tex.Civ.App.—Texarkana 1972, writ ref'd n.r.e.); *Roskey v. Gulf Oil Corp.*, 387 S.W.2d 915, 919 (Tex.Civ.App.—Houston 1965, writ ref'd n.r.e.); *Klostermann v. Houston Geophysical Co.*, 315 S.W.2d 664, 665 (Tex.Civ.App.—San Antonio 1958, writ ref'd); *Dellinger v. Skelly Oil Co.*, 236 S.W.2d 675, 677 (Tex.Civ.App.—Eastland 1951, writ ref'd n.r.e.); *Stanolind Oil & Gas Co. v. Lambert*, 222 S.W.2d 125, 126 (Tex.Civ.App.—San Antonio 1949, no writ). Recognizing that Texas courts have rejected the doctrine of abnormally dangerous activities as a basis for strict liability in the context of hazardous wastes, the court in *Barras v. Monsanto Co.* noted, "Mere knowledge of a dangerous situation imposes only a moral duty to warn or render aid, not a legal duty." 831 S.W.2d 859, 865 (Tex.App.—Houston [14th Dist.] 1992, writ denied) (citing *Ford Motor Co. v. Dallas Power & Light Co.*, 499 F.2d 400, 412 n. 20 (5th Cir.1974) (citing *Buchanan v. Rose*, 159 S.W.2d 109, 110 (Tex. 1942))).

■ Even if Texas law recognized the doctrine of abnormally dangerous activities as a basis for strict liability, the plaintiffs' claims do not fall within the parameters of § 519 of the RESTATEMENT. Section 519 imposes liability on one engaging in an abnormally dangerous activity "for harm to the person, land, or chattels *of another.*" (emphasis added). *See Wellesley Hills Realty Trust,* 747 F.Supp. at 102; *Hydro–Manufacturing, Inc.,* 640 A.2d at 958. The doctrine applies, therefore, to claims by an occupier of land harmed by an activity abnormally dangerous in relation to the area, which is carried on by a contemporaneous occupier of neighboring land. *Rosenblatt,* 642 A.2d at 186. The plaintiffs' claims call for an expansion of this doctrine to claims by subsequent occupants of the land on which the activity took place. *See id.* If Texaco's disposal of oil sediment and other wastes in earthen pits on the land constituted an abnormally dangerous activity, it engaged in the offensive activity at the time it owned the property. Thus, if Texaco caused harm to the property, it was to land it owned, not to the "land of another." Such activity falls outside the scope of § 519. *See Wellesley Hills Realty Trust,* 747 F.Supp. at 102; *Rosenblatt,* 642 A.2d at 188; *Hydro–Manufacturing, Inc.,* 640 A.2d at 958. As the court explained in *Wellesley Hills Realty Trust:*

> At the time Mobil operated the gas station and releases of oil inflicted harm to the property, Mobil owned the property. Thus, Mobil's operation of the gas station caused harm to property *of its own,* not property *of another.* The site became property of WHRT only after the contamination, the harm, had occurred. No matter how viewed, therefore, Mobil can not be accused of having caused harm to the property of another because of release of oil on its own property resulting from its operation of a gas station.

747 F.Supp. at 102 (emphasis in original). The court concluded, "It would be nonsensical to even formulate a rule that an actor is strictly liable for harm inflicted on his or her own property or person." *Id.* Similarly, in *Rosenblatt,* the court determined that it would be illogical to interpret the language of § 519 to hold the actor strictly liable for harm to the actor's own property in those cases in which, at some time thereafter, the property changed hands. 642 A.2d at 188. Furthermore, imposing strict liability on Texaco for the plaintiffs' losses, like imposing a duty of care in negligence, would violate the rule of *caveat emptor* in real estate transactions. *See Wilson Auto Enters. v. Mobil Oil Corp.,* 778 F.Supp. at 107.

Under analogous circumstances, even those jurisdictions which have adopted the doctrine of strict liability for the carrying on of abnormally dangerous activities have rejected similar claims by remote purchasers of land. *See, e.g., 55 Motor Ave. Co. v. Liberty Indus. Finishing Corp.,* 885 F.Supp. 410, 423 (E.D.N.Y.1994); *Wellesley Hills Realty Trust,* 747 F.Supp. at 101–02; *Rosenblatt,* 642 A.2d at 188–90; *Hydro–Manufacturing, Inc.,* 640 A.2d at 959; *Futura Realty v. Lone Star Bldg. Ctrs. (Eastern), Inc.,* 578 So.2d 363, 365 (Fla.App.3d Dist.), *review denied,* 591 So.2d 181 (Fla.1991). As the court explained in *Rosenblatt:*

> When an owner or occupier of land engages in activities which are related to such ownership and occupation and which are abnormally dangerous in relation to the particular site, we place upon the actor the burden of bearing the risk of any harm to neighbors which arises from the activity, notwithstanding the absence of fault on the part of the actor. This burden is justified when weighing the rights of the actor, who benefits from the activity, against those of occupants of neighboring land, who do not benefit and have no way of avoiding the harm to their property that may result from a dangerous activity on adjacent land. Subsequent users, however, are able to avoid the harm completely by inspecting the property prior to purchasing or leasing it. Thus, it is not unreasonable to expect subsequent users to bear the risk of such harm. We think, however, that it would be unreasonable to hold the prior user liable to remote purchasers or lessees of commercial property who fail to inspect adequately before taking possession of the property.

642 A.2d at 188.

Thus, the plaintiffs' strict liability claims fail for two reasons. First, Texas courts

have consistently rejected the doctrine of abnormally dangerous activities as a basis for strict liability under *Rylands* or as stated in § 519 of the RESTATEMENT (SECOND) OF TORTS. Second, even if Texas recognized the doctrine of abnormally dangerous activities as a basis for strict liability, the plaintiffs' claims do not fall within the parameters of such liability, as they do not entail injury to the property of another. Therefore, Texaco is entitled to summary judgment on the plaintiff's strict liability claims.

### III. *Conclusion*

The plaintiffs' claims of negligence, gross negligence, and strict liability are untimely, as they were not brought within two years of accrual, as required by the applicable statute of limitations. The plaintiffs' negligence and gross negligence claims fail because Texaco owed no duty to the plaintiffs, as subsequent purchasers, to refrain from depositing oil sediment and other wastes on its property. Moreover, their gross negligence claims are not viable because the plaintiffs have not demonstrated that Texaco was consciously indifferent to an extreme risk of harm to them. Finally, their strict liability claims are without basis, as Texas courts do not recognize the imposition of strict liability on landowners for engaging in abnormally dangerous activities. Consequently, the plaintiffs' common law claims are barred both procedurally and substantively.

Accordingly, Texaco's motion for partial summary judgment is GRANTED. The plaintiffs' claims of negligence, gross negligence, and strict liability are DISMISSED on the merits.

IT IS SO ORDERED.